# IN THE COURT OF APPEALS OF IOWA

No. 13-1036
Filed August 27, 2014

**WILLIAM H. KOEHN and**
**SHARON K. KOEHN,**
        Plaintiffs-Appellees,

**vs.**

**KOEHN BROS. FARMS, LLC,**
**WILLIAM J. KOEHN, and**
**KELLY J. KOEHN,**
        Defendants-Appellants.
_____

        Appeal from the Iowa District Court for Clayton County, Richard D. Stochl,

Judge.


        Two sons and their company appeal the district court's order declaring a

land contract between the sons' company and the sons' parents null and void.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**



        James Updegraff, West Union, for appellants.

        Steven E. Howes of Howes Law Firm, P.C., Cedar Rapids, and Kevin C.

Rigdon of Klatt, Odekirk, Augustine, Sayer, Treinen & Rastede, P.C., Waterloo,

for appellees.



        Considered by Danilson, C.J., Mullins, J., and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**MULLINS, J.**

William (Jeff) and Kelly Koehn, along with their company Koehn Bros. Farms, L.L.C., (collectively the Koehn Bros.) appeal the district court's order that declared a real estate contract between Koehn Bros. Farms and William and Sharon Koehn, the parents of Jeff and Kelly, null and void based on undue influence. The Koehn Bros. claim on appeal the district court incorrectly determined a confidential relationship existed between them and the parents, Sharon did not have full knowledge of the facts, and her conveyance was not an intelligent and voluntary act. The Koehn Bros. claim that even if there was a confidential relationship, they fully rebutted the presumption that the transaction was the result of undue influence. They also assert that if the district court's decision is to be upheld, fairness requires the parents to repay the amount the parents received from the Koehn Bros. minus what they would have received had no contract been executed. Finally, the Koehn Bros. ask that we reform the contract and the quitclaim deed to reflect the intent of the parties that the parents would receive a life estate in the house only and the Koehn Bros. would be responsible to provide a house in town should the parents ever want to leave the homestead. For the reasons stated herein, we reverse the decision of the district court and remand with instructions.

## I. Background Facts and Proceedings.

The parents in this case filed suit September 20, 2012, alleging the Koehn Bros. breached the terms of the real estate contract, procured the contract by undue influence, and failed to include all of the agreed terms into the contract resulting in a failure of the meeting of the minds. The Koehn Bros. generally

denied the allegations and filed a counterclaim seeking to reform the quitclaim deed to state the parents only had a life estate in the house and outbuildings and not the entirety of the farm property.

The case proceeded to a trial to the court on May 30, 2013. William did not testify or appear at trial due to his health. Sharon testified he has dementia, which he had been suffering from for about two years. Sharon testified as to her recollection of the events surrounding the real estate contract. She stated that they executed the contract to get the farm in the sons' names in case her husband had to go to the care center. Sharon recalled the sons saying that they would pay $100,000 for the farm and would buy them a house in town to live in if and when they desired to move into town. However, because the existing contract did not have this in-town house provision, Sharon asked the whole contract be thrown out.

She recalled the contract was signed in the basement of her house on a Sunday morning. The sons were present along with a lawyer who had drawn up the contract—Thomas David Katsumes. Sharon denied ever having seen the contract before, ever asking Katsumes to prepare the contract, or ever talking to Katsumes about selling the property to her sons. While she knew her sons and the lawyer were coming that day, she did not know there would be a contract to sign and had not previously spoken to her sons about the purchase price. She did acknowledge that Katsumes had previously prepared wills for her and William.

The purchase price of $100,000 was proposed by the Koehn Bros. The rental income that the parents had previously received from the farm was to

continue to come to the parents, according to Sharon's recollection. She admitted she consulted with a lawyer several years after the contract was signed, who told her the rental income was supposed to come to her under the contract terms. Sharon stated that she and William just signed the contract, did not read it, and were not told to take it to a lawyer. She believed the house and the land were worth far more than $100,000.

Since the contract was signed, Sharon asserted she has not received the rental income from the farm. She acknowledged the Koehn Bros. have done some maintenance on the property. She also acknowledged the Koehn Bros. have paid the taxes on the property. She asserted she and William would be willing to pay back the down payment the Koehn Bros. had paid if the contract was declared null and void.

On cross-examination, Sharon testified the agreement called for the $100,000 would be paid over time by the Koehn Bros. with a $20,000 down payment and payments of $5000 per year until the balance was paid. Sharon acknowledged after the contract was signed, the Koehn Bros. executed a quitclaim deed providing a life estate in the property to her and William. Sharon contended this was part of the original agreement but was not included in the contract.

Sharon admitted the Koehn Bros. have made payments under the contract including interest each year since it was signed in 2009, have received the rental income since that time, have paid the taxes on the property since that time, and have done some maintenance on the property as well. She stated she became unhappy with the contract "a year or two ago" when she went to the lawyer to

have the wills changed and found out that she should be getting the rental income on the farm under the life estate. She also testified the contract failed to state a date when the Koehn Bros. were to take possession of the property, but she did not object to them receiving the rental income until she spoke to the attorney a year or two before the trial. William and Sharon offered no further evidence in support of their claims.

The defense first called Jeff Koehn, the eldest of the two sons. He testified Koehn Bros. Farms, LLC was created to protect the family farm and take care of his parents. The company was set up during the time of the execution of the real estate contract. Jeff explained the contract came about after his father was approached by a government conservation program to buy the farm and prevent the land from being worked. Jeff said his father thought the government buyout was a good deal, but Jeff, along with his brother, explained to his parents that the price was not a good deal because it would leave them unable to generate income from the land but still obligate them to pay the taxes. Jeff stated, "[I]n our lifetime we've always looked out for the folks." Jeff also thought the deal would decrease the value of the property. However, the price of $100,000 for the land that was used in the real estate contract matched the amount of the conservation program buyout offer.

The intent was to keep the family farm to pass it on to the next generation. Jeff testified his sister was not included in the purchase because Sharon expressed to Jeff that she did not think the daughter could afford the down payment and the daughter's inheritance was taken care of through life insurance.

Jeff testified William "made note on several occasions that he didn't want to see his farm just returned back to the—the nursing home receive his farm."

Jeff contradicted his mother's testimony regarding the meetings at the house involving the sale of the farm. Jeff stated he asked his parents who they wanted for an attorney and Katsumes's name came up. Jeff had not previously done business with Katsumes. Before the day the contract was signed, Katsumes had been to the house with his parents, Kelly, and himself to discuss the terms of the sale. The ultimate deal was to provide that the sons would pay $100,000 for the property and the parents could live on the farm for their lifetime. If the parents wanted to move to town, the Koehn Bros. would purchase a place in town for them.

Jeff explained the $20,000 down payment was made pursuant to the contract, and they have regularly made the annual payments of $5000 to their parents. He said they have also made interest payments, even though interest was not a term in the contract, because his mother demanded interest be paid after talking with her tax consultant. He believed the interest rate that was agreed to was 2.5%. The Koehn Bros. have paid the real estate taxes for the property since March 2009, and have paid for maintenance and upkeep including repairs to the house, and repairs and clean up to the land after spring flooding. Koehn Bros. also purchased a mower for the property for William to use and maintained casualty and liability insurance on the property. The court admitted an exhibit of the expenses paid and the income received from the property since the purchase in 2009.

Jeff testified the agreement when the contract was signed was that his parents would stay and live in the house and have use of the outbuildings but not the farmland. Jeff explained his mother was concerned, after the contract was signed, that she have something in writing giving her the right to stay on the property, so Kelly executed the quitclaim deed with the understanding it would give his parents the right to the house only. He explained that the parties discussed that the rental payments from the farmland would be received by the company and that money would be used to make the annual $5000 payment on the contract. All other expenses for the purchase and maintenance of the farm would come out of the brothers' pockets. Jeff also admitted to paying for Katsumes's services for the real estate contract and quitclaim deed in 2009 and for more recent services in 2010 and 2012.

Katsumes testified at the trial. He stated he had represented Sharon and William several times over the past ten years by drafting wills and powers of attorney and counseling them with respect to estate planning. He remembered being contacted by Sharon in early 2008 to discuss the acreage and what they could do with it. He remembers that they wanted to give the farm to their sons and did not want to lose it to a nursing home if they had to go on Title XIX. Nothing was done at that time as the parents wanted to think about it. However, in late 2008, early 2009 he must have gotten a call because he went out to the house on January 10, 2009, and later prepared a contract that was signed January 24.

He stated the first meeting on January 10 took place at the parents' home with Jeff, Kelly, Sharon, and William present. He testified that during that

meeting, "I discussed with them the fact that they needed to make a clean break by having this sold on contract. They—could not—In the contract to avoid Title [XIX] consequences, they could not retain a life estate interest." He also remembered the sons saying that if their parents ever wanted to move to town "we'll buy a house in town, . . . we'll give you a place to live." Katsumes said William and Sharon "didn't want any chance that there would be any kind of a string-back in case they had to go on Title [XIX]. And I said as long as it's [a] separate document, my impression is there is no connection and you don't have to worry about it."

He believed the conversation lasted about two hours and the group either came up with the conclusion there, or someone called him later to tell him what the decision was with respect selling the acreage. He said his understanding of the agreement was the land would be sold to the sons for $100,000 with a $20,000 down payment and annual payments of $5000 for sixteen years. Based on this understanding, he prepared the contract and then came back to the home on January 24 to have the parties review it and sign. At the time the contract was presented, he explained the contract to all the parties involved, "every clause, every word," to make sure everyone knew what it said. He remembered going through the remedies if the buyers failed to make payments and there was a laugh about that. While the possession date was left blank, it was Katsumes's understanding that the sons would take possession of the property immediately. He also understood that the sons would get the rent from the farmland and would pay the taxes and insurance on the property but not the utilities.

Katsumes testified he received a call later that Sharon was requesting the life estate be in writing so he prepared the quitclaim deed. It was his intent as the drafter of the quitclaim deed that the life estate would only apply to the house in order to provide the parents a place to live as long as they wanted it.

Finally, the defense called Kelly to testify. Kelly remembered talking with his parents and Jeff at least three times regarding the property. The farm had flooded several times over the year and the government was offering a buyout that would tie up the property but still leave his parents obligated to pay taxes on it. So Kelly and Jeff thought if they bought it and paid his parents a little extra money, the parents could stay living there as long as they wanted. As Jeff had testified, Kelly remembered the purchase price was set based on what the government was offering to purchase the land for. Kelly testified the understanding was the farm rental income was to be paid to the company and the annual payment to the parents would come from that rental income. Kelly also admitted the company agreed to purchase a house in town for the parents should they no longer wish to remain in the homestead, though this was not included in the contract. Kelly's understanding of the life estate was that it would only extend to the house, not the farm as a whole, and the quitclaim deed was prepared after the land contract was signed so Sharon would have something in writing giving her the right to remain in the home.

Kelly acknowledged paying Katsumes for his work in preparing the real estate contract and quitclaim deed. He said the bill was sent to Sharon who then gave it to him to pay. He also admitted paying Katsumes to set up the LLC and

for the time Katsumes spent in 2012 speaking with Sharon's lawyer who had questions about the transaction and the rental income.

In rebuttal, Sharon reiterated that Katsumes did not come out to the house on January 10, 2009, to discuss the sale but only came out on a Sunday morning with a contract in hand. She stated she was not even aware of the existence of the quitclaim deed providing her and William a life estate until 2012 when she went to get a copy of the real estate contract. She maintained the contract was never explained to her, and she just signed it.

The court filed its ruling on June 20, 2013, finding Jeff and Kelly took advantage of their parents. The court noted Jeff testified the $100,000 government buyout was not enough to pay for the land and yet purchased the land for the exact same price. The court found both William and Sharon were elderly and relied on their sons to act in their best interests, but the sons were looking out for their selfish interests. The court concluded a confidential relationship existed between the parents and the sons.

Since there was a confidential relationship, Kelly and Jeff had to rebut the presumption that the contract was the result of undue influence and had to affirmatively establish that they did not take advantage of their parents and that their parents acted voluntarily with freedom, intelligence, and a full knowledge of all the facts. The court concluded Kelly and Jeff failed to rebut this presumption. It said the overwhelming evidence was that Sharon did not have a full knowledge of the facts of the transactions and that her conveyance was not based on an intelligent, voluntary act. The court therefore declared the real estate contract null and void, returning ownership of the property to William and Sharon. It also

held that William and Sharon shall retain all payments made to them by the Koehn Bros. since the signing of the contract to compensate them for the rent and other payments taken by the Koehn Bros. The court also provided the Koehn Bros should not be reimbursed for any expenses they incurred since the signing of the contract. Because the court nullified the contract, it did not rule on the Koehn Bros.'s counterclaim to reform the contract or quitclaim deed to reflect the life estate should extend only to the home and outbuildings.

The Koehn Bros. appeal.

## II. Scope and Standard of Review.

The parties dispute the standard of review that is applicable in this case. The Koehn Bros. assert the standard of review is de novo because the case was tried in equity at the district court. *See Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003). William and Sharon, however, claim the case was tried at law, and thus, our review is for correction of errors at law. *See* Iowa R. App. P. 6.907. We look to the "pleadings, relief sought, and the nature of the case" to determine whether the case was legal or equitable. *Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006). "We also consider 'whether the court ruled on evidentiary objections' as an important, although not dispositive, test of whether the case was tried in law or equity." *Id.* (citation omitted). Also "a trial court generally issues a 'decree' in an equitable action and a 'judgment' in a legal action." *Van Sloun v. Agans Bros. Inc.*, 778 N.W.2d 174, 178 (Iowa 2010).

The petition filed in this case by William and Sharon stated it was a petition at law. They alleged the Koehn Bros. failed to perform the agreement and terms of the land contract by failing to turn over the rental payments and

requested the court to declare the contract void. They also asserted the Koehn Bros. obtained their signatures on the contract by undue influence and asked the contract again be declared void. Finally, William and Sharon asserted there was no meeting of the minds making the contract null and void. William and Sharon also separately filed a jury demand. In response, the Koehn Bros. filed a motion to strike the jury demand, claiming William and Sharon were not entitled to a jury because their petition sought relief available only in equity as they were seeking to set aside the contract and deed and be restored to their position before the contract was executed, rather than seeking monetary damages. The court set the motion to strike of a hearing, but before that hearing occurred, William and Sharon withdrew their jury demand. The court entered an order finding "good cause" had been shown to grant William and Sharon's request to withdraw their jury demand. The hearing previously set was "canceled" by the court, and thus, there is no ruling from the court regarding whether William and Sharon were entitled to a jury trial.

The Koehn Bros. filed an answer to the petition and a counterclaim seeking reformation of the quitclaim deed. The case was tried to the court, where the court ruled on very few objections. One objection the court sustained involved hearsay. The witness had already answered the question by the time the objection was entered, but the court struck the answer. The court also required a party to lay more foundation when the other party objected to the admission of an exhibit. The court's final decision in the case was entitled "order" rather than "decree" or "judgment." The court declared the contract null and void based on undue influence and returned the property to the ownership of William

and Sharon. The court did order that William and Sharon were to retain all payments made to them under the contract to compensate them for the rental payments and government subsidies taken by the Koehn Bros.

An action based on a contract is normally treated as one at law. *Van Sloun*, 778 N.W.2d at 178. "Where the basic rights of the parties derive from the nonperformance of a contract, where the remedy is monetary, and where the damages are 'full and certain, remedies are usually provided by actions at law, and equity has no jurisdiction.'" *Id.* at 179 (citation omitted). However, "the action is ordinarily classified according to what appears to be its primary purpose or controlling issue." *Id.* Here, while Williams and Sharon allege the Koehn Bros. breached the contract by failing to pay them the rental income, the remedy they sought was for the contract to be declared null and void and to be restored as the owners of the property, not for the Koehn Bros. to be required to pay them the rental income. Rescission of a contract is governed by equitable principles. *Brinkholder v. Carpenter*, 152 N.W.2d 593, 596 (Iowa 1967). The Koehn Bros.' counterclaim sought reformation of the contract. The right to reform an agreement lies within the discretion of a court sitting in equity. *See Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 636 (Iowa 1996). Therefore, we find the case was tried in equity below, making our review de novo. We give weight to the factual findings of the district court, especially its assessments of credibility, but we are not bound by them. Iowa R. App. P. 6.904(3)(g).

## III. Undue Influence.

In order to set aside an inter vivos transfer based on undue influence, a party has to show "such persuasion as results in overpowering the will of the

[grantor] or prevents him from acting intelligently, understandingly, and voluntarily—such influence as destroys the free agency of the grantor and substitutes the will of another person for his own." *Mendenhall*, 671 N.W.2d at 454. The undue influence must be present at the time of the transfer, and the party making the claim has to prove the undue influence "by evidence that is clear, convincing, and satisfactory." *Id.*

However, where the grantor and grantee are in a confidential or fiduciary relationship, the transfer is presumptively fraudulent and a product of undue influence. *Id.* If such a confidential or fiduciary relationship is found to exist, the burden of proof shifts to the grantee to negate the presumption by clear, convincing, and satisfactory evidence that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily. *Jackson v. Schrader*, 676 N.W.2d 599, 605 (Iowa 2003).

**A. Confidential Relationship.** In order to determine the standard of proof and who held the burden of persuasion in this case, we have to answer the question of whether Jeff and Kelly had a confidential or fiduciary relationship with their parents. A fiduciary relationship is one where a person is under a duty to act for the benefit of the other as to matters within the scope of the relationship. *Mendenhall*, 671 N.W.2d at 455. No one asserts, and the district court did not find, a fiduciary relationship existed in this case.

A confidential relationship has been broadly defined as "any relation existing between two parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party." *Id.* "The gist of the doctrine of confidential relationship is the *presence of a dominant*

*influence* under which the act is presumed to have been done." *In re Estate of Clark v. Swope*, 357 N.W.2d 34, 37 (Iowa Ct. App. 1984). While a confidential relationship does not arise solely from a blood relationship such as between a parent and child, *id*., a confidential relationship is particularly likely to exist where there is a family relationship. *Mendenhall*, 671 N.W.2d at 455. The concept embraces "those multiform positions in life wherein one comes to rely on and trust another in his important affairs." *Id*. It "arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term 'confidential relationship.'" *Id*.

The district court concluded a confidential relationship existed between the parties. While it did not point to any specific facts that supported its conclusion, the court did state that William and Sharon were elderly and both trusted in their sons to act in their best interests. The record showed at the time of trial in January of 2013, William was eighty-seven and Sharon was seventy-five. This would make them eighty-three and seventy-one, respectively, at the time of the transaction in January of 2009. Sharon testified William had been suffering from dementia for two years by the time of trial, which would make the onset of the dementia approximately two years after the transaction occurred.

There was no testimony or evidence offered to indicate Sharon suffered from any mental or physical impairment at the time of the transaction. There was no indication in the evidence that either Sharon or William relied on either Jeff or Kelly in the management of their daily or business affairs. Jeff and Kelly clearly offered their advice to their parents that the government buyout offer was not in

their best interests, and Jeff testified the sons "always tried to look out for the folks." The advice offered by Jeff and Kelly was presumably taken to heart by Sharon and William as they did not enter into the government buyout transaction, instead selling the farm to their sons. However, it appears it was Sharon and William's intent to keep the farm in the family before the government buyout was even proposed, as they had discussed with Katsumes in early 2008 how to give the farm to their sons and avoid losing the farm if they had to go on Title XIX.

Our case law demonstrates that a confidential relationship will be found where a son was the grantor's agent and had for nearly twenty years managed the lands comprising the grantor's entire worldly estate, lived in the same house as the grantor, and spoke of the land to others as his own. *See Curtis v. Armogast*, 138 N.W. 873, 880 (Iowa 1912). Likewise, a confidential relationship was found where a nonrelative of the grantor handled more and more of the grantor's business affairs and eventually handled them completely, and the grantor was over ninety years old, nearly blind, and confined to her home. *See First Nat'l Bank v. Curran*, 206 N.W.2d 317, 319–20, 322 (Iowa 1973); *see also Mendenhall*, 671 N.W.2d at 460 (finding a confidential relationship between a mother and daughter where daughter managed the business to one degree or another for eight years, took care of the mother's daily physical needs, had a very close, loving and confidential relationship with the mother, and held a power of attorney for the mother). *But see Clark*, 357 N.W.2d at 38 (finding no confidential relationship where a father put a son's name on two savings accounts, the son never paid father's bills, and there was no evidence the son exerted influence over the father or assisted the father in any way with business

decisions); *Hatt v. Hatt*, 265 N.W.2d 640, 642 (Iowa 1936) (finding no fiduciary relationship between a father, a son, and a family friend when evidence showed the father had always looked after his own property and managed his own affairs and that none of his children nor the family friend ever controlled or managed his property up to the time of the execution of the trust agreement). While the evidence showed Sharon and William listen to, loved, and trusted their sons, we find the evidence does not show the kind of relationship where either Kelly or Jeff had a dominating influence over their parents such as would lead to the conclusion there was a confidential relationship here.

**B. Four Elements of Undue Influence.** Because the facts of this case do not support the conclusion a confidential relationship existed between the parents and their sons, the burden to prove undue influence by clear, convincing, and satisfactory evidence remained on the parents. They must have proved the following four elements:

> "(1) The [grantor] must be susceptible to undue influence, (2) opportunity [on the part of the grantee] to exercise such influence and effect the wrongful purpose must exist, (3) a disposition [on the part of the grantee] to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence."

*Mendenhall*, 671 N.W.2d at 454 (quoting *Estate of Herm v. Henderson*, 284 N.W.2d 191, 200-01 (Iowa 1979)). "Weakened mental condition of the grantor, relationship of the grantor and the grantee, inequality of distribution, and activity of the grantee are all factors that bear on the question of undue influence." *Id.*

*1. Susceptible to undue influence.* The evidence shows both William and Sharon were elderly at the time of the transaction, eighty-three and seventy-one,

respectively. We know William later went on to develop dementia, but there is no indication he was suffering from those effects at the time of the transfer in January 2009. We have no evidence that Sharon's mental or physical health was impaired at any time. Sharon worked during the marriage at local restaurants and cooked for thirty years for senior citizens at the Northland Agency on Aging. William painted water towers early in their marriage and then worked for the department of transportation for twenty years before retiring.

*2. Opportunity to exercise undue influence.* The couple had four children, of which three are still living. The two sons, Jeff and Kelly, live locally, and the daughter lives in the Iowa City. There is no information about the extent of the contact between Jeff and Kelly and their parents leading up to the execution of the contract nor is there any indication whether the daughter was made aware of this transaction before it occurred. However, there was testimony the parties considered including the daughter in the purchase but Sharon did not think the daughter had the resources for the down payment. There is no indication the sons handled their parents' daily or business affairs. Kelly asserts he met with his parents at least three times to discuss the deal. Both Jeff and Katsumes recall at least two meetings with everyone present. Sharon only recalls one meeting where she was presented with and signed the contract. Both Jeff and Kelly clearly expressed their opinion to their parents about the value of the government buyout offer, but it is unclear whether the parties' relationship led the parents to particularly rely on Jeff or Kelly for advice regarding their business dealings.

*3. Disposition to influence.* Katsumes testified to a meeting with William and Sharon in early 2008, approximately a year before the transaction, where he recalled the parents were concerned with the implication long-term care and Title XIX could have on their property. They expressed to him at that time a desire to give the farm to their sons, though nothing was executed at that time. Jeff and Kelly said their father initially thought the government buyout was a good idea, but the sons did not because it would cut off the stream of income to the parents and still saddle them with the cost of the taxes, insurance, and upkeep of the property. The deal proposed by Jeff and Kelly, and accepted by their parents as evidenced by the contract, kept the sale price the same but relieved the parents of the obligation to pay for property taxes, insurance, and upkeep.

While Katsumes had previously provided legal advice to William and Sharon, it does not appear that he offered them independent legal advice with respect to this transaction.

> Proper independent advice in these circumstances means "showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction."

*Id.* at 462 (quoting *Merritt v. Easterly*, 284 N.W. 397, 399 (Iowa 1939)). All of Katsumes's meetings regarding this transaction occurred in the presence of Jeff and Kelly, and he also represented Jeff and Kelly in the establishment of their limited liability company, which was set up to be the grantee of the transaction.

*4. Result appears to be effect of undue influence.* There was no evidence offered as to the value of the farm in January 2009. The parents had received

another similar, but less attractive, offer to purchase the farm from the government to ensure conservation efforts in the area of the river. Sharon thought the farm and house were worth far more than the $100,000 purchase price, but no party had the property appraised or had any idea as to its value at the time the contract was signed. The assessed value of the property at the time of trial, over four years after the contract was executed, was $150,000.

The parents were granted a life estate in the property, and Jeff and Kelly admitted to agreeing to purchase a house in town for their parents should the parents ever decide to leave the homestead. Both of those agreements have economic value. The daughter of William and Sharon was left out of the transaction, but Jeff recalled his mother saying that her inheritance was taken care of through life insurance.

Based on the evidence, Sharon and William did not prove by clear, convincing, and satisfactory evidence that the real estate contract was procured by undue influence. While independent legal advice for both parties would have been advisable in this case to ensure both parties were fully apprised of their rights and responsibilities, *see id.*, the evidence submitted by Sharon and William falls short to prove the Koehn Bros. induced them to sign the contract by undue influence. We therefore reverse the decision of the district court on this issue and hold the real estate contract executed in January 2009 should not be rescinded.

**III. Reformation of Real Estate Contract and Quitclaim Deed.**

We next address the Koehn Bros. counterclaim to reform the contract or quitclaim deed. This issue was not addressed by the district court because it had

declared the real estate contract void, making any claim to reform that contract moot. While we find the contract was not procured by undue influence, we also note the contract as written does not reflect the parties understanding of the agreement. In fact, Katsumes testified candidly that in order to satisfy the objectives of Title XIX planning, the contract was not intended to contain all the agreed terms; in particular, the life estate in the house and outbuildings on the property was omitted. The testimony of all witnesses confirms that another key term of the agreement—the purchase of a house in town should William and Sharon decide to leave the homestead—was not included in the contract.[1] We find it significant that even though Sharon sought to rescind the contract, she testified consistent with Jeff and Katsumes that the agreement was that she and William would have a life estate[2] and that the sons would provide a house in town when she and William decided to leave the farm.

On our de novo review of the evidence, we seek to reconcile any conflicts in the evidence and try to determine what evidence is more believable. *See, e.g.*, Iowa Civ. Jury Instruction 100.9. The undisputed evidence is that at the time the contract was executed, William and Sharon wanted to avoid losing the farm to Title XIX or a nursing home, they wanted to remain living in the home on the farm, and if they chose to no longer live on the farm, they wanted to be able to move to a home in town that the sons would provide. Less clear, but implicit, is that they wanted to maintain a cash flow from the farmland in an amount

---

[1] No one testified as to whether there was any discussion to include or omit this term from the contract. The evidence was simply that all agreed to the term.
[2] Though we acknowledge she maintains a different understanding of the extent of that life estate.

comparable to the rents they had been receiving. The evidence suggests that William wanted the sons to end up with the farm, but there is little evidence as to Sharon's personal wishes at that time in this regard. Selling the farm to Jeff and Kelly, even at what may have been a discounted price,[3] seemed like a plan which would accomplish all those objectives. The only problem was that in order to try to most efficiently accomplish the first objective—keep the farm from being consumed for nursing home care—they felt the need to have a secret, oral, side agreement.[4] This case is an example of the old saying that "an oral agreement is worth the paper it is written on." The reason for this litigation is the slight-handedness that was one of the objectives.

The problem with this arrangement started as a result of Sharon either (1) not understanding the importance of avoiding the paper trail, or (2) having such a strong mistrust of her sons that she insisted on written documentation of the life estate notwithstanding that such documentation may derail some of the planning. Based on our findings above, we believe the real estate description in the quitclaim deed that granted her and William a life estate in the whole farm resulted from a scrivener's error. Again, as we seek to reconcile the evidence, it is clear that all the parties were happily sailing along under the contract—sons were receiving rent, paying on the contract, paying taxes, and paying for improvements and upkeep—until a lawyer found the quitclaim deed and based on that deed advised Sharon that she should be getting the rent from the farm. Combine that with another scrivener's error in the contract that omitted the

---

[3] We render no opinion as to value; we only acknowledge a dispute regarding same.
[4] As demonstrated below, it seems that Sharon did not share this view.

possession date and you have the making of a dispute. By then, William was suffering from dementia so that he was unable to contribute to an understanding of the intent, and Sharon had decided that she and William had not made a good decision back in 2009.

"When the understanding of the parties was not correctly expressed in the written contract, equity exists to reform the contract to properly express the intent of the parties." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 151 (Iowa 2001). "[R]eformation is needed to give effect to the intention of the parties and to prevent unjust enrichment." *Id.* "[T]he requirement of mutuality of mistake does not apply to a mistake of a scrivener in reducing an agreement to writing." *Gouge v. McNamara*, 586 N.W.2d 710, 713 (Iowa Ct. App. 1998).

Jeff and Kelly have the burden to prove the contract should be reformed by clear, satisfactory, and convincing proof. *Akkerman v. Gersema*, 149 N.W.2d 856, 859 (Iowa 1967). This high burden is to prevent the courts from making contracts for the parties rather than making the written instrument speak the true contract. *Id.* William and Sharon contend the Koehn Bros. have not satisfied this burden because they are precluded from offering extrinsic evidence of the parties' intent by the parol evidence rule and the statute of frauds.

"[O]rdinarily parol evidence is admissible in actions for the reformation of legal instruments so long as the evidence is relevant and material." *Montgomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 474 (Iowa 1981). But a contract will be reformed "only if the party seeking reformation clearly and convincingly establishes" that the contract does not express the true intent of the parties because of "fraud or duress, mutual mistake of fact, mistake of law, or

mistake of one party and fraud or inequitable conduct on the part of the other."

*Id.* To reform the contract,

> a definite intention or agreement on which the minds of the parties had met must have preexisted the instrument in question. There can be no reformation unless there is a preliminary or prior agreement, either written or verbal, between the parties, furnishing the basis for rectification or to which the instrument can be conformed.

*Peak v. Adams*, 799 N.W.2d 535, 545 (Iowa 2011) (internal quotation marks and citations omitted).

All the evidence admitted at trial indicated the parents intended to remain living in the house as long as they wished, and the sons agreed to purchase, through the company, a house for their parents in town should the parents desire to move from the homestead. These terms were not included in the contract, and we hold the contract should be reformed to provide these terms. We next address whether the life estate for the farm house also extended to the farmland.

Sharon recalled that the rental income from the farm, along with the purchase price payments, were supposed to come to her and William. This would be consistent with the granting of a life estate to the entire property. *See Whitehall v. Whitehall*, 233 N.W. 748, 748 (Iowa 1930) (providing that ordinarily a life estate tenant is entitled to receive and retain the income from the land in the absence of an express intent to the contrary). However, the evidence indicated this opinion of Sharon was only developed after she consulted with a lawyer in 2012. Up to that point, the sons had received the rental income without objection from Sharon or William for 2009, 2010, and 2011. In fact, Sharon admitted she

had never even seen the quitclaim deed, which was the basis for the life estate, until she went to see the lawyer about the land contract in 2012.

Jeff, Kelly, and Katsumes all testified their understanding of the life estate, both at the time the real estate contract was signed and later when the quitclaim deed was signed, was that it extended to only the house and the outbuildings. As explained above, no life estate was put into the real estate contract initially due to Katsumes's concern that such a provision would make the family farm subject to a collection action if William and Sharon needed to apply for Title XIX in the future. In fact, during the signing of the contract Katsumes's believed the life estate was not really an issue between the parties—the parents knew the sons would not turn them out of the property. The sons wanted to provide a place for their parents to live for so long as the parents wanted to remain on the farm, but they were counting on the farm rental income to fund the annual payments on the real estate contract.

We conclude the Koehn Bros. have established by clear and convincing evidence that the life estate at issue here was intended by the parties to extend only to the house and the outbuildings. The farmland and the rental income that land generates was intended by the parties to go to the Koehn Bros. to help fund the annual payments to purchase the property from William and Sharon. While Sharon contends her understanding was to the contrary, we note she was not even aware of the existence of the quitclaim deed setting out the extent of the life estate until more than three years after the execution of the contract and after she consulted with an attorney who reviewed the language of the documents in question. Also, during those three years the Koehn Bros. had received the rental

income, and made the required annual payments, with no objection from William or Sharon.

We hold the real estate contract is hereby reformed as follows: (1) William and Sharon have a life estate in the house and outbuildings on the property at issue; (2) if William and Sharon choose to move off the farm to town, the Koehn Bros. shall purchase a suitable home in town for them, and upon their move to the home in town the life estate in the house and outbuildings on the farm property shall transfer to the town property thus extinguishing said life estate on the farm property; (3) the possession date left blank in the contract is the same date as the contract was signed; and (4) the interest rate left blank in the contract is the rate to which the parties had agreed and the Koehn Bros. had been paying—2.5% per annum. The farmland, and the applicable farm rental income generated by that land, is not subject to this life estate. Accordingly, and in light of the reformation contained above, the quitclaim deed is hereby declared null and void.

## IV. Conclusion.

Because we find the evidence admitted does not prove the Koehn Bros. exerted undue influence over Sharon and William with regarding to the execution of the real estate contract, we reverse the decision of the district court and hold the contract is not rescinded. In addition, we find the Koehn Bros. established the real estate contract and quitclaim deed did not accurately reflect the intent of the parties, and we grant relief as outlined in the foregoing paragraph. We remand for the court to determine a legal description—by agreement of the

parties, by survey ordered by the court, or as otherwise determined by the court—for the property subject to the life estate as set forth above and to enter such orders as are necessary to accomplish the holding of this opinion.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**