Roger K. MENDENHALL and Edwin
L. Mendenhall, Jr., Appellees,

v.

Marilyn Mendenhall JUDY, Appellant.

No. 02–0940.

Supreme Court of Iowa.

Nov. 13, 2003.

Thomas M. Walter of Johnson, Hester, Walter, Breckenridge & Duker, L.L.P., Ottumwa, for appellant.

Kenneth L. Keith and Joni L. Keith of Keith Law Firm, P.C., Ottumwa, for appellees.

LAVORATO, Chief Justice.

Two brothers, Edwin L. Mendenhall, Jr. and Roger K. Mendenhall, brought this equity action against their sister, Marilyn Mendenhall Judy. The brothers sought to set aside a transfer of stock in a family corporation that the children's mother, Gladys Mendenhall, made to Marilyn while Gladys was still alive. The district court set aside the transfer of stock on the grounds that the transfer resulted from undue influence that Marilyn had exerted over Gladys. Subject to two modifications, we affirm the judgment of the district court and remand the case for further proceedings consistent with this opinion.

## I. Scope of Review.

Because this action is in equity, our review is de novo. Iowa R.App. P. 6.4. In equity cases, especially when considering the credibility of witnesses, we give weight to the fact findings of the district court, but we are not bound by them. *Id.* R.6.14(6)(*g*).

## II. Applicable Law.

▮ To set aside a transfer on the ground of undue influence, one must show "such persuasion as results in overpowering the will of the [grantor] or prevents him from acting intelligently, understandingly, and voluntarily—such influence as destroys the free agency of the grantor and substitutes the will of another person for his own." *Leonard v. Leonard,* 234 Iowa 421, 429, 12 N.W.2d 899, 903 (1944). Undue influence must be present at the very time the transfer is made. *Arndt v.*

*Lapel,* 214 Iowa 594, 603, 243 N.W. 605, 609 (1932). Proof of undue influence must be by evidence that is clear, convincing, and satisfactory. *Else v. Fremont Methodist Church,* 247 Iowa 127, 139, 73 N.W.2d 50, 57 (1955). Evidence is clear, convincing, and satisfactory when there is no serious or substantial uncertainty about the conclusion to be drawn from it. *Raim v. Stancel,* 339 N.W.2d 621, 624 (Iowa Ct. App.1983). Direct proof of undue influence is not required. In fact, undue influence may be and usually is proven by circumstantial evidence. *Estate of Cory v. Ankeny State Bank,* 169 N.W.2d 837, 842 (Iowa 1969).

▮ Four elements are necessary to establish undue influence:

(1) The [grantor] must be susceptible to undue influence, (2) opportunity [on the part of the grantee] to exercise such influence and effect the wrongful purpose must exist, (3) a disposition [on the part of the grantee] to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

*Estate of Herm v. Henderson,* 284 N.W.2d 191, 200–01 (Iowa 1979). Weakened mental condition of the grantor, relationship of the grantor and the grantee, inequality of distribution, and activity of the grantee are all factors that bear on the question of undue influence. *Wilson v. Wilson,* 240 Iowa 26, 33, 34 N.W.2d 911, 915 (1948).

▮ A transfer to a grantee standing in a confidential or a fiduciary relationship to the grantor is presumptively fraudulent and therefore presumptively the product of undue influence. *Marron v. Bowen,* 235 Iowa 108, 112, 16 N.W.2d 14, 16–17 (1944). If such a relationship is found to exist, the

burden of proof shifts to the grantee to negate a presumption of undue influence by clear, convincing, and satisfactory evidence. *Herm,* 284 N.W.2d at 200. We have recognized that this "rule is particularly applicable where one of the parties has a dominating influence over the other by reason of the affection, trust, and confidence of the latter in the former." *Id.*

■ A fiduciary relationship includes a relationship in which one is under a duty to act for the benefit of the other as to matters within the scope of the relationship. *Merritt v. Easterly,* 226 Iowa 514, 517–18, 284 N.W. 397, 399 (1939).

■ We have referred to several principles in determining the existence of a confidential relationship:

Confidential relationship is a very broad term and is not at all confined to any specific association of the parties to it. In law it has been defined or described as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. In its broadest connotation the phrase embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs.

A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term "confidential relation."

*Herm,* 284 N.W.2d at 199 (citation omitted). Such a relationship is particularly likely to exist where there is a family relationship. *McGaffee v. McGaffee,* 244 Iowa 879, 888, 56 N.W.2d 36, 39 (1953). Moreover, a confidential relationship may exist although there is no fiduciary relationship. *Oehler v. Hoffman,* 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962).

### III. Facts.

With the foregoing principles in mind, we turn to the record in this case. On our de novo review, we find the following facts.

Gladys and Edwin Mendenhall, Sr. (Ed, Sr.) had three children: Edwin Mendenhall, Jr. (Ed, Jr.), Roger Mendenhall, and Marilyn Mendenhall Judy. Gladys and Ed, Sr. lived in Ottumwa, Iowa. Ed, Sr. owned and operated Hardsocg Pneumatic Tool Company. Hardsocg was founded in 1904, and its original business included contract machine work, engineering, assembly, and heat-treating. At one time, the company employed approximately forty-five people and made parts for M–47 tanks and jet engines. At the times material to this lawsuit, the company was an owner and lessor of real property, principally for warehouse and office space.

Roger has lived in California most of his adult life. He graduated from the University of Iowa with a B.S. degree in mechanical engineering and received an M.B.A. degree in 1984. Since 1956, Roger has worked for several companies in California.

Ed, Jr. has a B.A. degree in social science. Beginning in 1953, he worked with his father in the Hardsocg Company for about ten years, beginning in 1953. He had a purchasing background and filled such a need in the company at his father's request. Ed, Jr. left the company when it changed from a manufacturing business to a rental property operation. He moved to West Des Moines and regularly saw his parents on holidays.

Marilyn lived in California for several years and returned to Iowa in 1991. She has lived continuously in Ottumwa since 1993. She has worked in clerical and ad-

ministrative positions. She began helping Ed, Sr. with Hardsocg in 1995.

On June 19, 1995, Gladys executed a will that left all of her property in equal shares to her three children. On the same day, Gladys executed a general power of attorney that named Marilyn as Gladys's attorney-in-fact with Ed, Jr. as successor to Marilyn if Marilyn became unable to act. The power of attorney prohibited Marilyn from making gifts to herself.

In October 1995, Ed, Jr. and Marilyn opened a conservatorship for Ed, Sr. in Wapello County because he was having problems managing his business and other affairs. What led to the conservatorship was the fact that some woman was apparently "scamming" Ed, Sr. of large sums of money.

On August 1, 1997, Ed, Sr. died, leaving to Gladys an estate worth $417,241.22. The estate included 500 shares of Hardsocg stock valued at $296,193.79. The estate had debts totaling $42,000. Hardsocg's assets consisted primarily of three parcels of real estate. Ed, Jr. and Marilyn were appointed co-executors of the estate rather than Gladys because the three children believed Gladys, who was ninety-one years old at the time, did not have the ability to act as executor.

Following Ed, Sr.'s funeral, Gladys made known her desire that her estate be divided equally among her three children. At about the same time, Marilyn suggested to Ed, Jr.—in Gladys's presence—that they should figure out some way to disinherit Roger because he was wealthy and did not need anything. Ed, Jr. refused to go along with this suggestion.

Gladys suffered from many illnesses, some of which were attributed to old age. She had a severe hearing problem, poor eyesight, hypertension, chronic dizziness, gout, breast cancer, glaucoma, degenera-

tive joint disease, skin conditions, and a bowel condition. She also suffered from depression and progressive dementia. A hospital discharge summary dated October 14, 1996 covered a period of hospitalization from October 5 through October 14. The discharge summary included a final diagnosis of malignant hypertension, dementia with delirium, primary and degenerative. An October 8, 1996 consultation prepared by a psychiatrist concluded that Gladys had primary dementia with senile onset. A neurologist who examined Gladys noted in his report dated October 8, 1996 that Gladys had short-term memory deficits and cognitive deficits, but he also noted that her memory deficit "[d]oes not seem that bad for 90 years of age but clearly is impaired." Gladys took numerous daily medications.

After Ed, Sr.'s death, the three children discussed a guardianship for Gladys because of her health problems. Marilyn objected and nixed the idea.

Thereafter, Marilyn grew very close to her mother, calling on her five to six times a day to check on her and running Gladys's household as far as hiring caretakers. Gladys in turn became more and more dependent on Marilyn.

On October 5, 1997, the three children and Gladys had a telephone conference to discuss Gladys's assets, that is, where the money was, how much money there was, and what was to be done with it. Marilyn suggested that Gladys needed $1000 per month for living expenses and that she—Marilyn—needed more than the $125 per week she was receiving in wages from Hardsocg. Marilyn proposed taking Hardsocg as her third of Gladys's estate and she and her brothers could balance any difference as necessary. No agreement was reached on this proposition.

Following this conversation, Marilyn contacted attorney Rich Gaumer to pre-

pare a trust that would in effect direct the trustee to distribute all stock in Hardsocg to Marilyn. Gladys rejected the trust draft because it named a bank as trustee, something that Gladys did not want.

On November 10, 1997, Marilyn engaged attorney Vern Ball, an experienced probate lawyer, concerning Gladys's legal work, primarily relating to Gladys's gift of her Hardsocg stock to Marilyn. Ball's billing records for this work are in evidence, and they identify the meetings and phone calls he had with Marilyn and Gladys. Ball and Marilyn went to great lengths to document Gladys's intentions and competency even to the point of tape-recording at least one meeting.

Ball saw to it that the general power of attorney, which prohibited Marilyn from making gifts to herself, was amended. Tammy S. Huddleston of South Ottumwa Bank was added to the document as attorney-in-fact to allow gifts to Marilyn. There was considerable confusion in the testimony about whether Gladys actually signed the amended general power of attorney.

Ed, Sr.'s estate included the 500 shares of Hardsocg stock valued at $296,193.79. Because of the expense, the co-executors decided against an appraisal of the stock and used the tax assessment to establish the value. Unbeknownst to her two brothers, Marilyn hired an independent appraiser to determine the value of the shares for the transfer to her. The appraiser determined the value to be $207,919.10.

Ball recognized the potential issues that might arise with any gift of stock to Marilyn that was to the detriment of her two brothers. So Ball went to what the district court described as "extraordinary and careful lengths to determine and document Gladys's competency to execute the gift." To that end, Ball wrote a letter to Gladys's treating physician, Dr. Steven R. Ellison,

to determine Gladys's "testamentary capacity" to make the gift. In the letter, Ball explained to the doctor that Gladys had to have sufficient mental capacity to (1) understand the nature and extent of the instrument she has executed; (2) know and understand the nature and extent of her property; (3) understand the gift she desires to make; and (4) remember the natural objects of her bounty.

Ed, Sr.'s estate was closed on June 22, 1998. Three days later, Gladys signed a declaration of gift document that transferred all of her shares of stock in Hardsocg to Marilyn. The gift was conditioned upon (1) Gladys receiving $1000 per month from Hardsocg or Marilyn for the remainder of Gladys's life and (2) payment by Marilyn or Hardsocg of all of Ball's fees. Gladys signed the document in Dr. Ellison's office. Dr. Ellison also signed the document, stating that the gift to Marilyn was voluntary and not a result of undue influence. Dr. Ellison however did not thoroughly question Gladys about, or investigate the issues, of undue influence as Ball had requested.

Ball informed the two brothers of the stock transfer *after* it was made. The record is clear that neither brother knew what was happening until after the transfer was completed.

Shortly thereafter, Ball sent Tammy Huddleston instructions for completing the stock transfer to Marilyn provided that Huddleston believed "Gladys still has sufficient mental capacity and present desire to do so." On July 17 Gladys transferred the 500 shares of Hardsocg stock to Marilyn. Gladys executed the assignment on the shares of stock with Huddleston signing the assignment as attorney-in-fact. At the time of the transfer, Gladys was just short of her 92nd birthday.

Either on July 21 or July 29 Ball met with Gladys and Marilyn to determine what to do with the remainder of Gladys's estate. No decision was made on that date. However, later, Ball drafted a trust document dividing the remaining assets among the three children. On August 26 Gladys executed the trust document, which named her as trustee.

Marilyn paid for Ball's services. His time records show that he spent eighteen hours with Marilyn and seven hours with Gladys.

Hardsocg was generating at least $2500 per month in profit. Because the $1000 per month to Gladys was not enough to meet her needs, assets from the trust were used to supplement Gladys's care.

On September 29 Marilyn was named durable power of attorney for health care decisions on behalf of Gladys. Ball also prepared this document. On October 29 Gladys executed a codicil to her June 19, 1995 will. In the codicil, Gladys directed the transfer of her assets to the revocable trust and named Ed, Jr. and Marilyn as co-executors. Ball also prepared the codicil.

On May 13, 2001, Gladys was admitted to the hospital because of a bowel obstruction. The hospital records stated the following:

> She was kept comfortable with analgesics on a p.r.n. basis. She was not considered to be a surgical candidate as per her previous Advanced Directives and her daughter's wishes. Her condition continued to slowly deteriorate and she expired on May 21, 2001.

Gladys's final diagnosis included, among other things, dementia.

Before Gladys died, Marilyn told Roger, who was in the eastern part of the United States on vacation, that there was neither an urgency nor need to return home. Roger later learned from Ed, Jr., whose wife had contacted the hospital, that Gladys was terminal. Marilyn told neither brother of the possibility of surgery to correct the blockage. The brothers did not learn of Marilyn's recommendation against surgery until after this suit was filed.

Before Gladys died, Marilyn took all of her mother's jewelry, claiming that Gladys had given the jewelry to her. The gift was made without the approval of Tammy Huddleston as provided by the amended power of attorney. Marilyn neglected to tell her brothers that Gladys had given her the jewelry.

## IV. Proceedings.

On July 25, 2001, Ed, Jr. and Roger filed this lawsuit against Marilyn, alleging that the stock transfer was ineffective because of undue influence, misuse of a confidential relationship, and a breach of a fiduciary duty. In her answer, Marilyn denied these allegations. Additionally, she asserted the stock was effectively transferred and that a gift was completed. She admitted she had a fiduciary relationship with Gladys. In a response to a request for admission, Marilyn admitted the existence of a confidential relationship with Gladys to the extent Gladys had granted her a power of attorney.

Following a bench trial, the district court concluded that clear, convincing, and satisfactory evidence established that Marilyn had exerted undue influence over Gladys relative to the stock transfer. The court set aside the transfer, ordered a full accounting to the brothers of all financial transactions occurring since the date of the transfer, and directed that the stock certificates be delivered to the district court clerk pending further order of the court.

Additionally, the court ordered that if Marilyn wished to retain the stock, she had to pay each brother $84,731.26 within sixty days of the ruling. The $84,731.26 represented one-third of the stock value at the time of the transfer. The court entered judgment in favor of each brother for $84,731.26. If Marilyn failed to make such payments, the court ordered the stock sold within six months of the court's ruling. Proceeds from the sale would be applied to the costs of the action and to the judgments awarded to the two brothers. The balance of the proceeds would be paid to Marilyn.

Marilyn appealed and later applied for a supersedeas bond. The district court stayed the proceedings upon the posting of a supersedeas bond of $211,828.15. Later, Ed, Jr. and Roger, each subsequently filed a satisfaction of judgment stating the judgment "is paid and satisfied in full."

Ed, Jr. and Roger then moved to dismiss the appeal, contending that Marilyn's payment of the judgments resulted in her becoming the sole owner of the company, a substantial benefit. Because she received a substantial benefit, the brothers argued that Marilyn waived her right to appeal.

Marilyn resisted the motion, asserting that she made the payments involuntarily to avoid sale of the company's assets, she could not raise sufficient funds for the supersedeas bond, and she received no benefit by satisfying the judgments. Therefore, she concluded, she did not waive her right to appeal. We ordered the parties to brief and argue the appellate-waiver doctrine with the substantive issues raised on appeal.

## V. The Issues.

On appeal, Marilyn raises two issues. First, she contends the district court erred in setting aside the stock transfer on grounds that the transfer was procured by undue influence. Second, she contends that her payment of the judgments in lieu of posting a large and unobtainable supersedeas bond did not constitute a waiver of her right to appeal. We will consider the waiver issue first and then proceed to the undue influence issue.

## VI. The Appellate–Waiver Issue.

Pursuant to the appellate-waiver doctrine, "[o]ne who accepts material and substantial benefits under a judgment or decree may not ordinarily challenge the provisions under which such benefits are awarded." *In re Bruce,* 522 N.W.2d 67, 73 (Iowa 1994). To be effective, the waiver must be made voluntarily, intentionally, and with knowledge of the circumstances. *Johnson v. Johnson,* 301 N.W.2d 750, 752 (Iowa 1981). We have retreated from our strict application of the doctrine in earlier cases because of the potential for harsh results. *Id.* The burden of proof is on the party claiming waiver to show facts supporting such claim. *Id.* at 753.

We view the payments here were made under compulsion of court order. According to the order, Marilyn's failure to make the payments would result in a sale of the company's assets. In view of the order, we can hardly say that Marilyn "voluntarily" made the payments. *Hegtvedt v. Prybil,* 223 N.W.2d 186, 188 (Iowa 1974) ("Payment is not voluntary when it is made under compulsion of court order.").

The motion to dismiss the appeal is denied.

## VII. The Undue Influence Issue.

The district court found that clear, convincing, and satisfactory evidence established that a confidential and fiduciary relationship existed between Marilyn and

Gladys. As to these relationships, we agree with and adopt the following district court findings:

> The evidence establishes by clear, convincing, and satisfactory evidence that a confidential relationship existed between Gladys and Marilyn. Marilyn managed the Hardsocg business interests, in one degree or another, in an increasingly dominant manner, from 1993 to the time of Gladys's death. In addition, Marilyn either personally took care of or saw that Gladys's daily physical needs were met. A very close, loving, and confidential relationship existed between Marilyn and Gladys at the time of the gift of Hardsocg on June 25, 1998, and prior thereto.

> It is established by clear, convincing, and satisfactory evidence that a fiduciary relationship existed between Gladys and Marilyn. Marilyn held a power of attorney from Gladys since at least June 19, 1995. Clearly, Marilyn was under a duty to act for and advise Gladys pursuant to her duties as attorney-in-fact. Gladys placed her complete confidence in Marilyn and was subject to Marilyn's domination and influence.

> In addition, as mentioned, Marilyn admitted in her answer that she had a fiduciary relationship with Gladys and admitted in a response to a request for admissions that she had a confidential relationship with Gladys.

Our review of the district court ruling convinces us that although the court found that Marilyn breached her fiduciary and confidential relationship with Gladys relative to the stock transfer, the court did not shift the burden of proof to Marilyn. Rather without the benefit of the presumption, the court found that clear, convincing, and satisfactory evidence established that Marilyn exerted undue influence on Gladys regarding the transfer. In making that determination, the court went through the earlier mentioned four factors necessary to establish undue influence. We set out those findings, which we adopt as our own.

### A. A person is susceptible to undue influence. As to this factor the court found:

> The evidence establishes by clear, convincing, and satisfactory evidence that Gladys was susceptible to undue influence by Marilyn. Gladys, born July 24, 1906, was 91 years of age at the time of the gift of Hardsocg stock on June 25, 1998. Gladys had been diagnosed with primary degenerative dementia, senile onset, by psychiatrist Ronald R. Berges, D.O., on October 8, 1996. A diagnosis of dementia with delirium, primary and degenerative, was made by Dr. Macalalad, M.D. in October of 1996. Although Gladys was a strong-willed and opinionated woman, she was clearly susceptible to undue influence by Marilyn.

Several witnesses, including her attending physician Dr. Ellison, testified that Gladys was a strong-willed and opinionated person. These same witnesses testified that Gladys was mentally competent. From their testimony, it appears that Gladys was a very nice and decent person who had opinions about what she wanted to do. She was also described as high average in intelligence. She received her teaching certificate from Drake University.

Notwithstanding this evidence, the medical records we have mentioned and the medical opinions the district court referred to leave no doubt in our minds that Gladys's mental and physical condition was weakened during the critical period of time leading up to the transfer of the stock to Marilyn. By the time of Ed, Sr.'s death, all three children questioned Gladys's ability to serve as executor of her husband's estate. The children even discussed the

idea of a guardianship for Gladys because of her health problems. Because of her weakened condition, Gladys was readily subject to influence. Such a condition "has a direct bearing on the issue of undue influence." *Herm,* 284 N.W.2d at 200; *see also Monahan v. Roderick,* 183 Iowa 1, 6, 166 N.W. 725, 727 (1918) ("Conduct which might be insufficient to unduly influence a person of mental strength might be sufficient to so operate upon a failing mind.").

Moreover, Dr. Ellison did not adequately question Gladys to determine her "testamentary" capacity to make the transfer and whether she was making the transfer because of Marilyn's undue influence over her. Additionally, the testamentary standard that Ball instructed the doctor to use was inadequate for purposes of the transfer. A higher degree of mental competency is required for transactions of ordinary business than is necessary for testamentary disposition of property. *Costello v. Costello,* 186 N.W.2d 651, 654–55 (Iowa 1971).

**B. There is opportunity to exercise undue influence and a disposition to influence.** Relative to these two factors, the district court found:

> Marilyn had the opportunity to exercise undue influence over Gladys. Marilyn returned to Ottumwa, Iowa in 1993 and lived there continuously through the date of Gladys's death on May 21, 2001. Gladys's other two children, Ed and Roger, lived in West Des Moines and Huntington Beach, California, respectively, and were not in as frequent contact with Gladys in her later years. Marilyn is to be commended for her loving care of Gladys in Gladys's declining years. Ironically, that very care also carried with it the opportunity for Marilyn to exercise undue influence over Gladys. Marilyn had a disposition to unduly influence Gladys for the purpose of procuring the gift of the Hardsocg

stock. As noted, Marilyn started the legal work on the stock transfer through attorney Vern Ball in November of 1997, while a co-executor with Ed, concerning Mr. Mendenhall's Estate. *Three days* after Mr. Mendenhall's Estate was closed on June 22, 1998, Gladys executed the declaration of gift of Hardsocg stock to Marilyn. The Court does not conclude that Marilyn's only intent concerning Gladys was to unduly influence her for the purpose of obtaining the gift of Hardsocg stock. Marilyn clearly loved and cared for her mother and spent countless hours providing for her welfare. Even so, Marilyn clearly influenced Gladys as concerns the gift of Hardsocg stock.

There is other evidence bearing on these two factors. For example, Gladys had executed a will in June 1995 that left her property in equal shares to her three children. Shortly after Ed, Sr. died Gladys talked about dividing her estate equally among her three children. Ball testified that at his first meeting with Gladys in December 1997 Gladys wanted Marilyn to have the company, but as far as her whole estate was concerned she wanted "to treat her boys ... evenly." Ball was concerned about the issue of undue influence because he was aware Marilyn was in a confidential or fiduciary relationship with Gladys. It was that concern that prompted Ball to have Gladys's family physician examine Gladys and attest that Gladys was competent and that the transfer of the Hardsocg stock was not the result of undue influence.

Thereafter, Ball met with Gladys on February 12, April 21, and the latter part of July 1998. At the February 12 and April 21 meetings, Gladys was still considering transferring the stock to Marilyn but dividing her entire estate evenly among her three children.

The July meeting took place after the transfer of stock to Marilyn. Ball tape-recorded that meeting. It is clear from the recording that Gladys was unsure on how to divide the balance of her estate. One month later, Gladys executed a trust in which she was the trustee and in which she divided her remaining assets among her three children. Marilyn would therefore receive in value approximately half of the estate by virtue of the stock transfer and one-third of the balance of the estate by virtue of the trust. In total, Marilyn stood to receive two-thirds of Gladys's estate. *See Miller v. Doan*, 233 Iowa 315, 317, 6 N.W.2d 318, 320 (1942) ("If there is some direct or substantive evidence of undue influence, the fact that the last will differs from a previous one, that it is unnatural or inequitable, may be considered as tending to show the influence operated on the mind of the testator.").

From all of this evidence, we find that Marilyn was on a mission to make sure that her mother transferred the Hardsocg stock to her. Her intention was clearly apparent from the telephone conversation that took place among the mother and three children shortly after Ed, Sr. died. In that conversation, Marilyn proposed taking the Hardsocg stock as her third of Gladys's estate. One month later Marilyn hired Ball and together they not only accomplished this mission but more: Rather than ending up with one-third of Gladys's estate, Marilyn stood to end up with two-thirds.

Ball was not Gladys's attorney; rather he was Marilyn's attorney. Marilyn hired him and paid him. This leads to another disturbing fact. No one saw fit to have Gladys seek proper independent advice of her own choosing. In addition, Marilyn and Ball did not inform the brothers of the transfer until after it was completed, thereby depriving Gladys of the brothers' advice.

Proper independent advice in these circumstances means "showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefaction." *Merritt*, 226 Iowa at 528, 284 N.W. at 404 (citation omitted); *see also Luse v. Grenko*, 251 Iowa 211, 219, 100 N.W.2d 170, 175 (1959) (holding that independent advice to the transferor is an important consideration where there is a confidential relation between grantor and grantee who is in position of dominance; no showing that siblings were made aware of plan to make defendant joint payee of mother's bank account and bonds); *McGaffee*, 244 Iowa at 887, 56 N.W.2d at 39–40 (grantor's lack of independent advice material on question of undue influence by grantee in suit by grantor against grantee for cancellation of instruments assigning grantor's businesses to grantee). A lack of independent advice is sometimes sufficient in and of itself to set aside conveyances and contracts executed under such circumstances. *Marron*, 235 Iowa at 113, 16 N.W.2d at 17.

Clearly, the transfer was materially beneficial to Marilyn while at the same time materially disadvantageous to Gladys. The company was earning $20,000 per year, all of which would go to Gladys absent the stock transfer. The stock transfer limited Gladys's access to the company's income to just $12,000 per year. Gladys was giving up at least $8,000 per year to help with her living expenses. As it turned out, $12,000 per year was not

enough to meet Gladys's needs; assets from the trust were used to supplement her care.

### C. Result must clearly appear to be the effect of undue influence. As to this last factor, the district court found:

The result (gift of Hardsocg stock) clearly appears to be the effect of undue influence by Marilyn over Gladys. The timing of the gift as noted above, the fact that her brothers Ed and Roger were not advised of the gift ahead of time, the extraordinary lengths that attorney Vern Ball went to establish Gladys's competency at the time of the gift, and much of the other evidence produced in this case established the undue influence by Marilyn over Gladys.

To this we add some additional evidence. Apparently, Gladys had the notion that if she transferred the stock to Marilyn, Marilyn would keep her out of a nursing home. Marilyn knew this, and we are satisfied she used this knowledge to her advantage to convince Gladys to transfer the stock to her.

In sum, four significant factors that this court has said bear on the question of undue influence are present here: weakened mental condition of the grantor, relationship of the grantor and the grantee, inequality of distribution, and activity of the grantee. *See Wilson,* 240 Iowa at 33, 34 N.W.2d at 915. To this we add the stealthy way in which the transfer was made, that is, concealing the transfer from the brothers until after it was completed. *See Telsrow v. Telsrow,* 237 Iowa 672, 680–81, 22 N.W.2d 792, 798 (1946). We are satisfied the evidence clearly, convincingly, and satisfactorily establishes that Marilyn exerted undue influence over Gladys concerning the stock transfer. The decision

to make the transfer was not Gladys's but Marilyn's.

### VIII. Disposition.

Although we agree with the district court, we think its judgment should be modified as follows. Because Marilyn has paid for the stock and now owns it, we think the accounting the district court ordered should conclude with the date Marilyn paid for the stock. If the clerk of the district court of Wapello County has not already done so, the clerk shall release the stock to Marilyn. With those modifications, we affirm the judgment of the district court and remand the case to that court for further proceedings consistent with this opinion.

**AFFIRMED AS MODIFIED AND CASE REMANDED WITH DIRECTIONS.**

All justices concur except WIGGINS, J., who takes no part.