# IN THE COURT OF APPEALS OF IOWA

No. 15-1739
Filed August 17, 2016

**SHARION STALZER,**

      Plaintiff-Appellant,

**vs.**

**DEBRA K. SMITH as EXECUTOR OF THE
ESTATE OF ROBERT F. DARNER and
DEBRA K. SMITH, INDIVIDUALLY,**

      Defendant-Appellee.

_____

      Appeal from the Iowa District Court for Marshall County, Timothy J. Finn, Judge.

      Plaintiff appeals the district court decision denying her claims of undue influence, breach of a fiduciary duty, and tortious interference with a bequest. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

      Brandon W. Ruopp of Moore, McKibben, Goodman & Lorenz, L.L.P., Marshalltown, for appellant.

      Nicole S. Facio of Newbrough Law Firm, L.L.P., Ames, for appellee.

      Considered by Vogel, P.J., and Doyle and Bower, JJ.

**BOWER, Judge.**

Plaintiff Sharion Stalzer appeals the district court decision denying her claims of undue influence, breach of a fiduciary duty, and tortious interference with a bequest. We determine there was a confidential relationship and Debra Smith met her burden to show by clear, convincing, and satisfactory evidence Robert Darner made inter vivos gifts to Debra freely, intelligently, and voluntarily, except for a transfer of $15,200, which was used to purchase a vehicle for Debra's son. We conclude this transaction should be set aside and this amount should be returned to Robert's estate. We affirm the district court's conclusions Sharion failed to show a breach of fiduciary duty or tortious interference with a bequest. We reverse the award of trial attorney fees and award no appellate attorney fees.

## I.    Background Facts & Proceedings

Robert and Yvette Darner had two children, Sharion and Debra. Yvette died in 2000 and all of her property passed to Robert. After her mother's death, Debra began visiting her father in Marshalltown on a daily basis. Sharion was not as close to her parents. Before her mother's death, Sharion visited about two or three times a year, and she continued this pattern in visiting her father over the next several years. After his wife died, Robert granted Debra a remainder interest in his home, subject to a life estate. Eventually, Debra quit her job, stating she was going to concentrate on taking care of her family and Robert.

On December 10, 2006, Debra sent Sharion a letter stating Robert "made the choice a while ago to put everything in my name and to get everything when he is gone. Payment for taking care of him." Debra stated when the house was

sold the money would be put in a trust for Robert "and what if anything left will be mine as well as anything else, the cars, furniture." Debra stated she felt she had earned it. When Sharion asked Robert about the letter, he stated, "I just wish you girls would get along."

In 2007, Robert sold his house in Marshalltown and moved to an apartment in Gilman, Iowa, the town where Debra lived. After the move, Robert stopped driving and Debra provided all of his transportation. Robert transferred his money to joint checking and savings accounts he set up with Debra at Great Western Bank. Debra assisted Robert with his financial affairs.

Robert added Debra to the title of a 1965 Ford Galaxy 500 convertible. Robert paid $20,000 for the restoration of the convertible. He paid $7000 for a trailer for the convertible, placing the title for the trailer in the names of Debra and her husband, Mont Smith. Also, Debra borrowed $12,500 from Robert to purchase a camper. She stated Robert told her not to pay him back, and the camper was a gift from him to her family.

On January 11, 2008, Robert met with attorney Richard Weiss to execute a new will, leaving seventy-five percent of the residue of his estate to Debra and twenty-five percent to Sharion.[1] He also executed a general power of attorney and a combined living will and power of attorney for health care decisions, naming Debra as his attorney in fact. Debra stated she drove Robert to the appointment but waited in the lobby while her father met with Weiss. Later in 2008, Robert purchased a Chevrolet Impala for $17,000, which was titled in the names of Debra and Mont, and they used this vehicle to transport Robert.

---

[1] Robert's previous will left each of his daughters fifty percent of his estate.

In 2010, Robert inherited about $200,000 from his brother. He consulted with financial advisor Gary Schaudt at Great Western Bank about the funds. After giving Debra a gift of $13,000 and Mont a gift of $12,000, Robert placed most of the rest of the money in a Franklin Templeton account, which was transferrable on death to Debra.

In August 2011, $15,200 was moved from Robert's savings account to Debra's checking account. Debra testified the money was used to purchase a vehicle for her son, Jeremy Smith, and the vehicle was titled in Jeremy's name.

Robert fell and suffered a neck fracture in 2012. He was confined to a wheelchair and moved to a nursing home. In order to make transportation easier, Robert purchased a handicap accessible van for $18,000, putting the title in Debra's name. After Robert moved to the nursing home, Sharion began visiting him more often.

Robert died on December 2, 2013. At the time of Robert's death, most of his assets were held jointly with Debra. Debra was named as the executor of Robert's probate estate.

On November 24, 2014, Sharion filed an action against Debra, the executor of Robert's estate and individually, claiming the inter vivos transfers from Robert to Debra should be set aside on the ground of undue influence, Debra breached her fiduciary duties as Robert's attorney in fact, and Debra tortiously interfered with a bequest to Sharion from Robert.

At the hearing, held on August 19, 2015, Debra testified she worked very hard to do things as her father directed her to do and all of the gifts from him to her and her family were at the instigation of Robert. She stated when Robert

lived in Gilman she asked him to let her know when he was leaving his apartment so she would not worry about him. She testified to an incident when Robert was taken to the hospital and he asked her not to tell Sharion.

Sharion testified she did not have a close relationship with her mother or father due to past incidents. She stated Robert quit driving because Debra took his car and keys away from him. Sharion stated when Robert was living in Gilman, he would need to check with Debra before he could go anywhere with Sharion. Sharion testified that after Robert was living in the nursing home, Debra called her and told her Robert did not want to see her. Sharion stated she ignored this and continued to visit her father. She stated he always seemed glad to see her and never told her he did not want her to visit. Sharion testified Debra got very mad when she visited her father shortly before he died. Sharion's husband, Cyril Stalzer, also testified Debra got very mad when he and Sharion came to visit Robert shortly before he died.

Weiss did not have any independent memory of the meeting when Robert changed his will. He testified it was his practice to meet with the client alone. Schaudt testified Debra was present when Robert set up the Franklin Templeton account. He stated there was no mention of Sharion or a discussion of Robert's will. Schaudt testified Robert was an active participant in the meeting and he expressed his wishes in regard to his money. He stated Robert understood the transfer on death account would go to Debra on his death.

The district court entered a ruling on September 18, 2015. The court stated, "In this case it is unclear as to when a confidential or fiduciary relationship began between Debra and her father." The court went on to find Robert "freely,

intelligently, and voluntarily" made inter vivos gifts to Debra. The court found Debra did not breach her fiduciary duties as Robert's attorney in fact. The court additionally found Debra did not tortiously interfere with a bequest to Sharion. The court determined Robert's actions to exclude Sharion from his estate were due to his hurt feelings because she was not more involved in his life, rather than due to the actions of Debra. The court ordered Sharion to pay $5000 for Debra's attorney fees. Sharion now appeals.

## II. Inter Vivos Transfers

In general, a party seeking to set aside inter vivos transfers must prove their cause of action by clear, satisfactory, and convincing evidence. *In re Estate of Todd*, 585 N.W.2d 273, 277 (Iowa 1998). "Where a confidential relationship is found to exist, and inter vivos conveyances are challenged, the burden of proof shifts to the benefitted parties to prove—by clear, satisfactory, and convincing evidence—their freedom from undue influence." *Id*. When there is a confidential relationship, the grantee of the transaction must prove "by clear, satisfactory, and convincing evidence that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Jackson v. Schrader*, 676 N.W.2d 599, 605 (Iowa 2003).

The rule concerning confidential relationships "is particularly applicable where one of the parties has a dominating influence over the other by reason of the affection, trust, and confidence of the latter in the former." *Todd*, 585 N.W.2d at 276. The Iowa Supreme Court has stated:

A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which

dominion may be exercised by one person fall within the general term "confidential relation."

*Mendenhall v. Judy*, 671 N.W.2d 452, 455 (Iowa 2003). A confidential relationship "is particularly likely to exist where there is a family relationship." *Id.* A confidential relationship may exist where there is not a fiduciary relationship. *Id.*

Our review on this issue is de novo. *In re Estate of Herm*, 284 N.W.2d 191, 199 (Iowa 1979). "We give weight to the fact-findings of the trial court but are not bound by them." *Id.* "Of course this also applies to our review of trial court's finding of the existence of a confidential relationship." *Id.*

The district court found there was a confidential relationship between Debra and Robert, stating, "In this case it is unclear as to when a confidential or fiduciary relationship began between Debra and her father." We agree with the court's conclusion Debra and Robert were in a confidential relationship. Robert relied upon Debra for his transportation, to assist with his financial affairs, and to perform day-to-day chores. Also, Debra and Robert were in a fiduciary relationship, at least from the time she became his attorney in fact. *See Mendenhall*, 671 N.W.2d at 460 (finding clear, convincing, and satisfactory evidence a fiduciary relationship existed between a mother and daughter, noting the daughter held a power of attorney for the mother and had a duty to act for and advise the mother).

Due to this confidential relationship, Debra had the burden to prove by clear, satisfactory, and convincing evidence she acted in good faith throughout the transactions in which she received inter vivos gifts and Robert made the gifts

freely, intelligently, and voluntarily. *See Jackson*, 676 N.W.2d at 605. We note for many of the gifts made to Debra, Robert received a benefit as well. By making Debra a joint owner of his bank accounts, Debra had access to Robert's funds to pay his expenses, including his nursing home costs.[2] By purchasing first the Impala, and then the handicap accessible van, Robert provided Debra with a convenient way to transport him to his appointments. Several witnesses testified about Robert's pride in the restored convertible. As to the gifts where both Robert and Debra benefitted from the gift, we find Debra met her burden to show Robert made these gifts freely, intelligently, and voluntarily.

Schaudt testified about the Franklin Templeton account and the circumstances of the gifts of $13,000 to Debra and $12,000 to Mort. He testified Robert was an active participant in the meeting, he expressed his wishes in regard to his money, and Robert understood the transfer on death account would go to Debra on his death. We find Debra met her burden as to these transactions.

Debra testified she borrowed $12,500 from Robert to purchase a camper. She stated during a family camping trip her sons brought Robert to the campgrounds for a day, where he went fishing "and he had a great day." She testified the next day Robert told her he did not want to be repaid for the camper. We determine Debra met her burden to show by clear, convincing, and satisfactory evidence Robert forgave the debt for the camper freely, intelligently, and voluntarily.

---

[2] It is unclear if Debra received any benefit from being given a remainder interest in the house in Marshalltown. After the house was sold, the proceeds were placed in Robert's bank account and much of these funds were used to pay his nursing home expenses.

Finally, on August 22, 2011, $15,200 was withdrawn from Robert's savings account and deposited into Debra's checking account. Debra stated this money was used to purchase a vehicle for her son, Jeremy, which was titled in Jeremy's name. On this transaction she stated only, "My dad knew about the vehicle." We conclude Debra has not met her burden concerning this transaction. Unlike the other transactions, there is no evidence to support a finding Robert intended the transfer to be a gift. We conclude this transaction should be set aside and the amount of $15,200 should be returned by Debra to Robert's estate.

### III. Fiduciary Duty

As noted above, Debra was in a fiduciary relationship with Robert. The General Power of Attorney signed by Robert provided, "My Attorney-in-Fact shall not be liable for any loss sustained through an error of judgment made in good faith, but shall be liable for willful misconduct or breach of good faith in the performance of any of the provisions of this power of attorney." Sharion had the burden to prove a breach of a fiduciary duty by a preponderance of the evidence. *See Linge v. Ralston Purina Co.*, 293 N.W.2d 191, 194 (Iowa 1980). Our review on this issue is for the correction of errors at law. *Capitol Sav. & Loan Ass'n v. First Fin. Sav. & Loan Ass'n*, 364 N.W.2d 267, 271 (Iowa Ct. App. 1984).

We determine the district court was correct in concluding Sharion did not meet her burden to show Debra engaged in willful misconduct or failed to act in good faith in the performance of any of her duties as Robert's attorney in fact. When Debra signed checks or withdrew funds from Robert's bank accounts, she did so at his direction. Acting as Robert's attorney in fact, Debra withdrew funds

from the Franklin Templeton account to pay for his nursing home care. We affirm the district court's conclusion Sharion failed to show Debra breached her fiduciary duties while acting as Robert's attorney in fact.

### IV.    Tortious Interference with a Bequest

The Iowa Supreme Court has set out the tort of intentional interference with a bequest as follows, "One who by fraud or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to others for the loss of the inheritance or gift." *Huffey v. Lea*, 491 N.W.2d 518, 520 (Iowa 1992). Our review of the district court's ruling on this issue is for the correction of errors at law. *Id.*

The district court concluded Sharion had failed to show she would have received a bequest from Robert if not for the actions of Debra. We find no error in the court's conclusion. Robert voluntarily changed his will to give Debra seventy-five percent of the residue of his estate and Sharion twenty-five percent. He also voluntarily made the inter vivos gifts to Debra and her family as set out above, which greatly reduced the amount of his estate which would pass under the will. We affirm the district court on this issue.

### V.    Attorney Fees

**A.**    In her answer to the petition, Debra requested attorney fees, but did not set out any basis for awarding the fees. The issue of attorney fees was not raised in Debra's trial brief. At the close of the trial, Debra's attorney asked the court to consider awarding attorney fees, stating "I understand that this is in equity and common law proceedings, but I am concerned about the motivation in

bringing this lawsuit and the cost to my client in terms of this would have cost her over $10,000 at this point to defend." Debra's attorney filed an affidavit stating the total amount of Debra's attorney fees were $13,061. The district court ordered Sharion to pay $5000 toward Debra's trial attorney fees.

"Generally, a party has no claim for attorney fees as damages in the absence of a statutory or written contractual provision allowing such an award." *Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003). Debra did not request attorney fees based upon a statutory or contractual provision,[3] and instead asked for common law attorney fees. "To obtain common law attorney fees, a party must prove 'that the culpability of the [opposing party's] conduct exceeds the 'willful and wanton disregard for the rights of another standard'' required to prove punitive damages." *Id.* (citation omitted). "The opposing party's conduct 'must rise to the level of oppression or connivance to harass or injure another.'" *Id.* (citation omitted). Our review on this issue is de novo. *Id.*

We note the district court did not give any reasons for the award of attorney fees. On our de novo review, we conclude Debra has not shown Sharion's motivation in bringing this suit was due to a willful and wanton disregard for the rights of another, or that the action rises to the level of oppression or connivance to harass or injure Debra. *See id.* We determine the award of $5000 in attorney fees should be reversed.

---

[3] On appeal, Debra claims the attorney fees are authorized by Iowa Code § 633B.116(3) (Supp. 2014). This claim was not raised before the district court and we conclude it has not been preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002).

**B.**   Debra seeks attorney fees for this appeal, citing section 633B.116(3).  Even if we assume Sharion's claim of breach of fiduciary duty was brought under chapter 633B,[4] section 633B.116(3) provides, "The court *may* award reasonable attorney fees and costs to the prevailing party in a proceeding under this section."  (Emphasis added.)  "Courts usually hold that fee provisions using the word 'may' place the decision about whether to award *any* attorney fees within the sound discretion of the district court."  *Lee v. State*, 874 N.W.2d 631, 644 (Iowa 2016).  In exercising our discretion, we determine no appellate attorney fees should be awarded.

Costs of this appeal are assessed one-half to each party.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[4] While Sharion's petition requested damages under a theory Debra breached her fiduciary duties while acting as Robert's attorney in fact, neither the parties nor the court cited to chapter 633B or specified Sharion was requesting relief under the statute.