# IN THE COURT OF APPEALS OF IOWA

No. 18-0069
Filed March 6, 2019

**LYNDA CICH, EXECUTOR OF ESTATE OF JUNE McLEISH, LYNDA CICH, HEIDILYN LEAVITT, and HEATHERLYN LAMBERT,**
    Plaintiffs-Appellees,

**vs.**

**MARK McLEISH,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Bremer County, Colleen D. Weiland,

Judge.

    Mark McLeish appeals the probate of June McLeish's will. **AFFIRMED AND**

**REMANDED.**

    Christopher F. O'Donohoe of Elwood, O'Donohoe, Braun & White, LLP,

New Hampton, for appellant.

    James J. Burns of Miller, Pearson, Gloe, Burns, Beatty & Parrish, PLC,

Decorah, for appellees.

    Heard by Vogel, C.J., Vaitheswaran, J., and Gamble, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**VAITHESWARAN, Judge.**

June McLeish executed a will under which one of her sons, Mark, would receive land known as the Hawkeye farm and her three daughters would receive land known as the Maynard farm. June transferred the Hawkeye farm to Mark during her lifetime.

June's health deteriorated, and she eventually entered a nursing home. She gave Mark power of attorney over her affairs, including power "[t]o transfer, assign, convey, and deliver any real or personal property." The document she executed stated Mark would "be liable for willful misconduct or breach of good faith in the performance of any of the" document's provisions.

Mark sold the Maynard farm for $862,500 and deposited the net proceeds of $782,917.90 into an investment account he opened at a firm where his daughter-in-law worked. Shortly thereafter, Mark presented June with a "transfer on death beneficiary designation form." June designated Mark the "100%" beneficiary of the account.

The sisters learned of the sale at their mother's funeral. One of the sisters, Lynda Cich, who served as executor of June's estate, sued Mark in her capacity as executor and in her individual capacity.[1] Her two sisters, Heidilyn Leavitt and Heatherlyn Lambert, also were named plaintiffs in the lawsuit. The sisters alleged (1) Mark breached his fiduciary duty "by selling the [Maynard farm] for substantially less than its fair market value" of $1,061,000; (2) Mark used his confidential

---

[1] Mark served as executor of the estate until his resignation.

relationship with June "to wrongfully benefit himself to the exclusion of others"; and (3) Mark intentionally interfered with receipt of their inheritance.

Following trial, the district court entered judgment of $1,029,344 in favor of the executor, "for distribution to the three plaintiffs, individually, pursuant to the last will and testament of June McLeish."

On appeal, Mark challenges the district court's determinations that (1) he had a confidential relationship with June, (2) he breached a fiduciary duty under the terms of the power of attorney, (3) he intentionally interfered with the sisters' inheritance, and (4) the sisters were entitled to damages under the doctrine of ademption.

## I. *Confidential Relationship*

A confidential relationship exists "whenever a continuous trust is reposed by one person in the skill and integrity of another." *Mendenhall v. Judy*, 671 N.W.2d 452, 455 (Iowa 2003). "A transfer to a grantee standing in a confidential or a fiduciary relationship to the grantor is presumptively fraudulent." *Id.* at 454. To rebut the presumption, the fund recipient must "prove by clear, satisfactory, and convincing evidence that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Jackson v. Schrader*, 676 N.W.2d 599, 605 (Iowa 2003).

The district court found a confidential relationship based on the following evidence: (1) "Mark had been in a fiduciary relationship with June since 2008 by virtue of the power-of-attorney" and (2) "the evidence established that, from at least 2008, June relied on Mark for assistance and advice." We review the fact findings de novo. *Id.* at 603.

By virtue of his power of attorney, Mark had a fiduciary relationship with June for four years preceding her death. *See Mendenhall*, 671 N.W.2d at 455 ("A fiduciary relationship includes a relationship in which one is under a duty to act for the benefit of the other as to matters within the scope of the relationship."); *Trumm v. Iowa [Nat.] Heritage Found.*, No. 15-0813, 2016 WL 3272295, at *10 (Iowa Ct. App. June 15, 2016) ("As Robert's attorneys-in-fact under the durable [power of attorney], Joe and Betty were in a fiduciary and confidential relationship with Robert." (citing *Mendenhall*, 671 N.W.2d at 460)); *In re Estate of Frye*, No. 13-1170, 2014 WL 3511827, at *8 (Iowa Ct. App. July 16, 2014) ("One acting under a power of attorney is a fiduciary required to act in the principal's best interests." (citing *In re Estate of Crabtree*, 550 N.W.2d 168, 171 (Iowa 1996))). That fact alone created a confidential relationship, rendering his sale of the Maynard farm presumptively fraudulent.

Mark attempted to rebut the presumption by testifying June "made her own decisions" and "[y]ou couldn't tell her any other way." He characterized the sale of the Maynard farm as "a financial decision" based on depletion of June's funds to pay for nursing home care. He noted that June expressed a desire to sell the farm to the tenants farming the land and was satisfied with the value.

Mark's testimony did not establish that he acted in complete good faith. *Jackson*, 676 N.W.2d at 605. There was no evidence Mark conferred with his sisters about the need to sell the farm to pay for June's continued nursing home care. And, as the district court found, there was no evidence "to demonstrate June's bills, assets or financial status" at the time of sale or evidence "from caregivers or experts as to June's competency or cognitive abilities" at the time of

sale. Finally, as the district court also found, the transfer-on-death beneficiary form was "even more suspicious." Mark could not "recall" whether he or June contacted the investment firm to make the change, but he admitted to retrieving the paperwork from the firm and bringing it to June for her signature. One of the sisters testified the signature did not appear to be June's. Mark furnished no expert testimony to controvert this testimony. In short, the record lacked clear, satisfactory, and convincing evidence of good faith on Mark's part.

Mark's testimony also was insufficient to establish June acted freely, intelligently, and voluntarily in connection with the Maynard farm sale and the subsequent appropriation of sale proceeds. *Id.* Mark's two aunts testified June lacked the mental capacity to manage her own affairs. Based on weekly visits to the nursing home, one stated June "did not know who her living relatives were" and she was "[p]retty far gone by" the time of the farm sale. The other described June as "incompetent" and "delusional" and plagued by "[l]oss of memory." She testified June was completely reliant on Mark, because she "had no money, and she had no checkbook."

Mark's three sisters did not see their mother as often as his aunts did, in part because of geographical distance. But when they visited, they uniformly found her to be disoriented. One testified to receiving a call from Mark explaining that June was on dementia medication. Another stated June was unable to recognize her and was "very confused" around the time of the Maynard farm sale. The third sister similarly testified June stopped recognizing her despite "virtually daily [telephone] contact." In her words, June was "[one] hundred percent" dependent on Mark. Again, the record lacked clear, satisfactory, and convincing evidence to

establish June freely made decisions about the Maynard farm sale and disposition of the proceeds.

We conclude the district court acted equitably in finding a confidential relationship between Mark and June resulting in a presumption of a fraudulent transfer and in concluding Mark failed to rebut the presumption.

## II.     Breach of Fiduciary Duties as Power of Attorney

Mark contends the district court should not have found he breached his fiduciary duties under the terms of the power of attorney.  Our discussion above resolves this issue.  We conclude the district court acted equitably in finding a breach of fiduciary duty.  *Cf. Trumm*, 2016 WL 3272295, at *11 (holding nephew, under power of attorney, did not act in good faith in executing real estate contract for uncle, due to uncle's "mental incapacity, the disadvantageous terms of the sales contract . . . , [his] awareness of the terms of [his uncle's] will, and the fact that the price on the contract was below market value").

## III.     Intentional Interference with Inheritance

The Iowa Supreme Court has recognized "an independent cause of action for the wrongful interference with a bequest."  *Frohwein v. Haesemeyer*, 264 N.W.2d 792, 795 (Iowa 1978).  "[I]n an intentional interference case, the wrongdoer's unlawful intent to prevent another from receiving an inheritance is the key issue."  *Huffey v. Lea*, 491 N.W.2d 518, 521 (Iowa 1992); *see also In re Estate of Boman*, No. 16-0110, 2017 WL 512493, at *10 (Iowa Ct. App. Feb. 8, 2017) (setting forth elements of the tort).

The district court concluded:

[T]he plaintiffs have proven that they expected to receive an inheritance from June upon her death. Mark testified that he was aware of June's will's provision regarding the Maynard farm, so the court considers this element also met. And the plaintiffs have clearly suffered damages as a result of their loss of inheritance.

Two other elements require more discussion. For the plaintiffs to succeed in this claim, the court must additionally find (a) that Mark intentionally and improperly interfered with the plaintiffs' expectance and (b) a reasonable certainty that the plaintiffs would have received an inheritance but for the interference.

If the sale of the Maynard farm were the only act in question, the court would not be able to find that the plaintiffs met their burden on the "intentional and improper interference" element. The need for funds provides an explanation for Mark's acts as agent that is reasonable, and there are not suspicious extenuating circumstances as to the sale.

But that element is not as easily discarded as to the beneficiary designation. The court recognizes that the only direct evidence as to Mark's actions and intent (or lack of it) is Mark's testimony. But the circumstances make it impossible to take Mark's testimony at face value. "Direct and circumstantial evidence are equally probative." After having executed the Maynard farm sale agreement, the sale closing and the opening of the [investment] account as June's agent, this court cannot believe that June then decided on and was able to accomplish the beneficiary designation without Mark even knowing. Even if the court accepts that June was cognitively competent and that the signature on the designation is indeed hers, it would have to believe that June made these arrangements despite her significant hearing loss, which made telephone communication difficult. It would have to accept that June told Mark nothing of her plan and knew just where to sign on both forms, even though she had relied on him for other recent financial transactions. It would have to accept that Mark, even though he was June's financial fiduciary, did not even inquire as to what documents he was transporting from and to [the investment firm]. The court would have to ignore that whoever filled out the initial [investment] account application was very clearly the same person who filled out the beneficiary designation forms with Mark's birthdate and social security number—the most likely candidates being Mark or his daughter-in-law. Finally, the court would have to accept that, for no discernable reason, June decided to cut her daughters out of her will after Mark had already received the farm that she had devised to him. These are circumstances that the court cannot ignore or accept.

In regard to the final element, the court concludes that the plaintiffs have demonstrated a reasonable certainty that they would have received an inheritance but for Mark's interference. They would have at least received the sale proceeds remaining in the

[investment] account, even if some of the funds had been expended for June's care.

The plaintiffs' burden of proof on their claim of intentional interference is a preponderance of the evidence, and the court concludes that they have met that low burden.

(footnote and citation omitted). We could not have analyzed the claim any better. On our de novo review, we fully concur in the district court's findings and conclusion that Mark interfered with the sisters' inheritance.

## IV. *Damages – Ademption*

"Ademption means 'a taking away' and generally refers to removing or eliminating a specific bequest from a will or trust before the death of the testator." *In re Steinberg Family Living Tr.*, 894 N.W.2d 463, 468 (Iowa 2017) (citing *In re Estate of Anton*, 731 N.W.2d 19, 23 (Iowa 2007)). "[A]demption occurs where a testator had knowledge of a transaction involving a specific devise, realizes the effect of the transaction on his or her estate plan, and has an opportunity to revise the will. Where these elements are not present, no ademption occurs." *Anton*, 731 N.W.2d at 26.

The sisters alleged no ademption occurred and they were entitled to damages equivalent to the fair market value of the Maynard farm. The district court agreed with the sisters on the sale of the Maynard farm. Specifically, the court stated "failure of the devise is presumptively inconsistent with [June]'s intent, and [u]nless the presumption is rebutted the specific devise does not fail." The court concluded Mark failed to "overcome that presumption as to the sale." Based on this conclusion, the court awarded the sisters damages equal to the fair market value of the property, minus the amount of a mortgage loan that was satisfied.

On appeal, Mark contends the court inappropriately awarded damages "based on the [Plaintiff's] ademption claim which was denied by the court." Mark's real challenge is not to the court's discussion of ademption but to the amount of damages awarded by the court. Specifically, he contends the court should have deducted "capital gains tax which would have been paid by the decedent on her federal and state income tax returns for calendar year 2011 and again for the cost of probate administration."

Mark did not raise these damage items at trial, nor did he file a post-trial motion asking the court to revisit these damage amounts. Accordingly, we could conclude he failed to preserve error. *See Semler v. Knowling*, 325 N.W.2d 395, 399 (Iowa 1982) ("Since the damage issue was not preserved for appeal, we have nothing to review in that regard."). We bypass this error preservation concern and proceed to the merits. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999).

The district court ordered the subtraction "of any costs necessary for final administration of the probate proceedings." And, as the sisters note, "The trial court specifically assigned the damage award to . . . June's estate" and, accordingly, "[a]ny taxes owed will therefore be charges against the damage award in that matter." In short, Mark received the relief he is now requesting.

## V. *Appellate Attorney Fees*

The sisters request an award of appellate attorney fees. In *Huffey*, the court stated, "We are strongly committed to the rule that attorney fees are proper consequential damages when a person, through the tort of another, was required to act in protection of his or her interest by bringing or defending an action against a third party." 491 N.W.2d at 522. In light of this statement, we remand to the

district court for consideration of an award of appellate attorney fees.  *See In re Herrera*, 912 N.W.2d 454, 473 (Iowa 2018); *De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 191–92 (Iowa 2016).

**AFFIRMED AND REMANDED.**