# IN THE COURT OF APPEALS OF IOWA

No. 17-2010
Filed March 6, 2019

**IN THE MATTER OF THE ESTATE OF JEAN PEAK HADSALL, Deceased.**

**JOHN D. HADSALL,**
     Appellant.

_____

     Appeal from the Iowa District Court for Warren County, Jeffrey D. Farrell, Judge.

     John Hadsall appeals the probate court's judgment ordering him to return $383,595.63 to his mother's estate. **AFFIRMED.**

     Anthony Zane Blessum and Susan R. Stockdale, Winterset, for appellant.

     Nicholas A. Carda and Ryan Ellis of Ellis Law Offices, P.C., Indianola, for appellee.

     Heard by Doyle, P.J., and Mullins and McDonald, JJ.

**DOYLE, Presiding Judge.**

Attorney John Hadsall, son of decedent Jean Hadsall, appeals the probate court's judgment ordering him to return $383,595.63 to his mother's estate. The court determined John had a confidential relationship with Jean and transferred essentially all of her assets into accounts owned by him, contrary to Jean's wishes. Because John failed to establish he acted in good faith while making the transfers or that Jean acted freely, intelligently, and voluntarily in gifting him money from her accounts, the court ordered John to return money to the estate. Upon our review, we affirm.

### I. Background Facts and Proceedings.

In 1990, as part of their estate plans, Jean and Robert Hadsall established the revocable "Robert C. Hadsall and/or Jean A. Hadsall Trust." Jean and Robert transferred their farmland into the trust. Upon the death of the surviving spouse, the trust provided that any trust property "shall be equally divided" between their four children, per stirpes. In accordance with the trust, Jean also executed a last will and testament bequeathing any property not held by the trust to the trust upon her death.[1] Both instruments identified Jean and Robert's four children, including their sons John and Bruce.

Robert Hadsall passed away in December 2007. In January 2008, John, an attorney licensed to practice law in Florida, drafted for Jean a document titled "Voluntary Appointment of Durable Power of Attorney/Healthcare Surrogate." Jean designated John as her power of attorney, and she executed the document

---

[1] Jean later amended her will, but the substance was not changed in relative parts.

before a notary. John thereafter regularly assisted Jean with her financial affairs.

Jean subsequently sold the farm in two parcels; the first in January 2008 and the second in February 2008. The farm machinery was sold in June 2008. The funds she received from those sales were not deposited in accounts owned by the trust. Neither were other monies Jean received, such as life insurance proceeds relating to Robert's death. Rather, the funds were deposited into mostly new accounts in Jean's name, wherein John was generally named as a joint owner.

At some point, John's siblings questioned what was happening with Jean's assets. In 2010 and 2013, John wrote letters to his siblings on Jean's behalf to advise them of Jean's "wishes and to stop wrongful and false accusations." John's 2010 letter, addressed to his three siblings, stated:

> With this year's gift, Mom has given us all $40,000 in the past 4 years for a total of $160,000 out of her's and Dad's estate, the remainder in certificates of deposit in hers and our names to be given upon her death to her surviving children with a further distribution after payment of her bills and taxes from the sale of the farm; please join me in hoping her good health remains for many, many years.

John's 2013 correspondence—"An Open Letter to [Each of My Siblings] from their brother John"—stated:

> For almost the past month I've heard from family, friends and colleagues that I've been accused of embezzlement and [am] facing . . . years in prison for ripping our Mother off of her estate based upon the review of four (4) of her personal bank savings account statements, three (3) of which contain identical amounts and although not stated on the statements for whatever reason that only the bank knows are held in trust for immediate initial distribution upon her death to you three equally. The other account containing less than one-third of the aforementioned accounts was specifically stated to be in trust for me, and since it was less than the other three, it was assumed I must have raided it; actually it was the operating account from which the $40,000 . . . we've all already received came

from. The most important missing aspect of these accusations is the fact our Mother also has an additional checking account and two (2) additional savings accounts which not only contains any and all of the funds in question alleged to have been embezzled but additional amounts from Dad's accidental death life insurance policies payable to Mom albeit taxes, etc. will be deducted.

I'm glad I've been in the position I've been in regards to the farm and parents. I've not spent our Mother's estate, it's all there, and quite frankly, she can do with it as she pleases as long as she's of sound mind, just as you and I can do with our estates without unwarranted oversight.

This letter was signed by John and by Jean.

Jean passed away in 2016. For a short period of time prior thereto, Jean lived in a nursing home. Both John and Bruce agreed their mother was of sound mind until that time. At the time of her death, Jean's main bank account held only $819.53. On the basis of that balance, John helped his mother fill out the application for state medical assistance. The "No" box was selected on the application in answer to the question, "Did anyone in your home sell or give away anything of value for less than its value within the last five years?"

After Jean's death, Bruce could not locate any of his mother's estate documents. He then filed a petition before the probate court seeking to open an estate, and Bruce asked to be appointed the administrator. John subsequently filed a motion to dismiss the petition, stating Jean "did not die intestate" and had died "with a valid living trust known to all of her children for years." The petition for administration was set for hearing. The probate court thereafter granted the petition and appointed Bruce administrator. John then filed a "Motion for Assessment of Fees and Costs," asserting Jean's estate planning documents were easily accessible at the recorder's office, listing the date and page of the document's recording information. He again requested the matter be dismissed

since it was not an intestate matter, and he requested fees be assessed against the proponents of the action. John's motion was denied, but he was allowed to file his request as a claim against the estate.

Bruce located a copy of Jean's 1990 will filed with the recorder's office. The estate filed a motion for hearing on the will. John resisted. The estate filed a motion to construe John's conduct as Jean's power of attorney pursuant to Iowa code chapter 633B. A rocky discovery process followed. Ultimately, a trial was held on the matters in 2017.

Bruce and John each testified. Bruce, on behalf of the estate, produced numerous bank documents showing monies transferred from Jean's account into John's accounts. John admitted the transfers were made. He maintained he made every transfer at his mother's direction, stating Jean gave him gifts over the years. He testified his siblings were jealous she chose to give him more than them. Bruce had a different take, testifying he believed his mother "had full trust in John [but was] unknowing of what was going on. She . . . wasn't getting her banking accounts [statements]. After a certain point in time they were going to [John's] address. I don't think she had a clue if she had any money."

Following the trial, the probate court entered its order finding in favor of the estate. In a thorough and well-written ruling, the court concluded John had a confidential relationship with Jean, during which John transferred to himself Jean's assets and could not show he acted in good faith or with Jean's free, intelligent, and voluntary assent. Consequently, the court concluded John's actions were the result of his undue influence. The court ordered John to return $383,595.63 to his mother's estate. Other facts will be discussed as necessary below.

John now appeals.

## II. Standard of Review.

The parties agree the case was tried in equity and our review is de novo. *See* Iowa Code § 633.33 (2017); Iowa R. App. P. 6.907; *Jackson v. Schrade*r, 676 N.W.2d 599, 603 (Iowa 2003). "In a de novo review, the appellate court examines the facts as well as the law and decides the issues anew." *Brede v. Koop*, 706 N.W.2d 824, 826 (Iowa 2005). "When reviewing factual findings, particularly on the credibility of witnesses, we give weight to the probate court's findings, but we are not bound by them." *In re Tr. No. T-1 of Trimble*, 826 N.W.2d 474, 482 (Iowa 2013); *see also* Iowa R. App. P. 6.904(3)(g). "As difficult as it is to assess credibility of live testimony, it is more difficult to assess credibility from a cold transcript." *Zaerr v. Zaerr*, 222 N.W.2d 476, 477 (Iowa 1974); *see also Trimble*, 826 N.W.2d at 493 ("The probate court heard the live testimony . . . while we must rely on a cold transcript."). These principles also apply to the review of the probate court's finding of the existence of a confidential relationship. *See In re Estate of Herm*, 284 N.W.2d 191, 199 (Iowa 1979).

## III. Discussion.

On appeal, John contends the probate court erred in three respects. First, he argues he did not have a confidential relationship with his mother. On that basis, John next asserts the court incorrectly found he had the burden to show he acted in good faith and with Jean's assent and the estate failed to establish the transfers were the result of John's undue influence over Jean. Finally, John offers the alternative argument that, should we agree with the probate court that he had a confidential relationship with his mother and did not meet his burden to show

there was not undue influence on his part, the court erred in its overall calculation of the amount he allegedly owes. For the following reasons, we disagree.

### A. *Confidential Relationship.*

A confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind." *Oehler v. Hoffman*, 113 N.W.2d 254, 256 (Iowa 1962). Such a relationship

> has been defined or described as any relation existing between parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. In its broadest connotation the phrase embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs. A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term "confidential relation."

*Dibel v. Meredith*, 10 N.W.2d 28, 30 (Iowa 1943). Neither a fiduciary relationship nor a blood relationship is required to have a confidential relationship, though those conditions may increase the likelihood of such a relationship. *See Mendenhall v. Judy*, 671 N.W.2d 452, 455 (Iowa 2003); *Oehler*, 113 N.W.2d at 256. "That a person by kind and considerate treatment induces an affectionate regard on the part of another raises no presumption of confidential relation . . . in the absence of some showing that by this means a dominant influence was obtained over the other." *Oehler*, 113 N.W.2d at 256.

If a gift is "obtained by a person standing in a confidential, or a fiduciary relation to the donor," the "gift" is "presumptively fraudulent." *Marron v. Bowen*, 16 N.W.2d 14, 16 (Iowa 1944). Put another way, where "a confidential relationship exists, a transaction by which the one having the advantage profits at the expense

of the other will be held presumptively fraudulent and voidable." *Herm*, 284 N.W.2d at 200. The purpose of this general principle is "to defeat and correct betrayals of trust and abuses of confidence." *Oehler*, 113 N.W.2d at 256.

On appeal, John essentially takes issue with court's factual findings. Though he asserts the probate court "ignored the evidence regarding Jean's mental capacity," the court clearly found Jean was competent. The court simply found that her competency did not rule out the existence of a confidential relationship between Jean and John. While a person's diminished mental capacity could be a factor in determining whether a confidential relationship exists, we, like the probate court, believe a confidential relationship can exist between a mentally sound donor and a trusted donee, when the donor places trust and ability in another to act on the donor's behalf in the donor's best interests and complicit with the donor's interests.

At trial, John did not dispute that Jean put her trust in him to assist in her financial matters. She relied upon his advice, as her son, who was an attorney that handled numerous legal matters for her and her husband. She even permitted John to receive her bank statements. That Jean could have been more active in her financial affairs does not prohibit a finding of the existence of a confidential relationship. Upon our de novo review, we agree with the probate court that the record clearly evidences a confidential relationship existed between Jean and John.

### B. Undue Influence.

The existence of a confidential relationship triggers a presumption of undue influence. *Mendenhall*, 671 N.W.2d at 454. Because there was a confidential

relationship between Jean and John, the burden was on John to show he acted in good faith or with Jean's voluntary and knowing assent. *See Jackson*, 676 N.W.2d at 605. John's testimony is the only evidence he offered to support his actions. However, the court did not find John's testimony credible, and we find no reason to disagree with the court's finding upon our de novo review of this record.

Of particular significance are the two letters written by John to his siblings. John argues Jean could have fully funded her trust at any time prior to her death and her lack of action evidences her intent. But the two letters clearly implied Jean intended to divide all of her assets equally between the four children. And, as the probate court pointed out, the 2013 letter specifically stated "that Jean had accounts which contain[ed] 'all funds in question' plus proceeds from [his father's] insurance policies." However, the evidence shows "all the funds in question" were not, at that time, in Jean's accounts. Rather, substantial funds had been transferred from Jean's accounts to John and his wife's accounts, where Jean had no ownership over the assets. John "asserted that he had not spent Jean's estate and that 'it's all there,'" but it was not. The court found Jean's signature on the letter showed "she continued to follow her plan to give to all of her children equally." Moreover, why write the letter at all if she had no intent to distribute all of her assets equally? Similarly, why not ask John to draw up a new will? Jean was clearly a woman of action. We believe her lack of action combined with John's letters without any mention that there were no funds in the trust or that Jean had given substantial assets to John demonstrates she was not aware of the circumstances regarding her finances. Ultimately, we agree with the probate court that John failed to meet his burden that the numerous transfers of assets from Jean's accounts to

his accounts during her lifetime were made in good faith and at Jean's direction or with Jean's understanding or assent. His failure to meet his burden establishes his actions were the result of his undue influence upon Jean. Consequently, we agree with the probate court's conclusion that John was required to refund "gifts" from Jean to the estate.

### C. Amount of Money Owed to Estate.

Finally, John asserts the amount the probate court determined he was to return to the estate was unsupported by the evidence. He seems to argue that had he not placed the funds in his accounts, Jean would have spent some of the money, so the amount calculated should be lower. He does not explain what he believes that amount should be.

The amount of an award is generally an issue for the trier of fact, and appellate courts will not disturb the award when it is within a reasonable range of evidence. *See Stender v. Blessum*, 897 N.W.2d 491, 517 (Iowa 2017). Upon our de novo review of the record, we find no reason to disturb the probate court's calculation of the amount of money John is to return to the estate.

### IV. Conclusion.

Because John was in a confidential relationship with Jean, and because he failed to show that his transfers of substantial amounts of Jean's assets from her accounts to his were made in good faith or at the direction of or with the assent of Jean, we agree with the probate court that John must return the "gifted" assets to Jean's estate. Additionally, the amount calculated by the probate court to be returned was within the permissible range of evidence, and we find no reason to

disturb the calculation. We therefore affirm the probate court's ruling in all respects.

**AFFIRMED.**