**IN THE COURT OF APPEALS OF IOWA**

No. 24-0526
Filed July 23, 2025

**DIANNE LAWRENCE, PAUL STRUVE, and RONALD STRUVE,**
        Plaintiffs-Appellants,

**vs.**

**PERRY STRUVE, CLAYTON STRUVE, and STRUVE BOYS FARMS, LLC,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Clinton County, Patrick A. McElyea,

Judge.


        Three children of George Struve appeal the denial of their claims that gifts

of land to George's son Perry Struve and grandson Clayton Struve were procured

through undue influence.  **AFFIRMED.**


        A. John Frey Jr. and T. Randy Current (argued) of Frey, Haufe & Current,

P.L.C., Clinton, for appellants.

        Jonathon C. Fox (argued) of Mitvalsky, Van Vooren & Fox, P.C., Moline,

Illinois and Steven E. Balk of Pepping, Balk, Kincaid & Olson, Ltd., Silvis, Illinois,

for appellees.


        Heard at oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SCHUMACHER, Presiding Judge.**

Dianne Lawrence, Paul Struve, and Ronald Struve (collectively, Plaintiffs) challenge the validity of gifts of farmland their father George Struve made to their brother, Perry Struve, and to Perry's son, Clayton Struve.[1] Plaintiffs allege these gifts were procured through undue influence and the deeds should therefore be set aside. Following a bench trial, the district court denied all of Plaintiffs' claims.[2] The district court determined Perry was in a confidential relationship with George but that Perry successfully rebutted the presumption of undue influence arising therefrom. The district court determined no confidential relationship existed between George and Clayton and that Plaintiffs failed to prove Clayton exerted undue influence upon George. Upon review, we affirm.

**I.      Background Facts & Proceedings**

The evidence presented at trial reasonably supports the following facts. George was a farmer all his life. And farming was a generational trade for George: George's grandson Clayton wanted to farm, George's son Perry farmed, George farmed, George's father farmed, and George's grandfather farmed. George's passion for farming was the farming operation, not the financial aspects of farming. George's wife Delores managed the farm finances, but she also placed value on the family tradition of farming.

---

[1] Because many of the parties share a last name, we reference the individual parties by their first names.

[2] Plaintiffs also brought unjust enrichment claims against the collective "Defendants": Perry, Clayton, and Struve Boys Farms, LLC (a limited liability company of which Clayton was a member). Plaintiffs sought restitution as a remedy. On appeal, Plaintiffs do not challenge the district court's denial of the unjust enrichment claims.

While George's farming practices may have been less than desirable by those looking to maximize productivity and yield, George's love of life on the farm was absolute.[3] George and Delores continually declined to expand the acres they rented to Eric Meyer, a farmer who for years rented a small portion of George's farmland. As Meyer testified, the Struves knew renting to Meyer could produce more income for the farm. But their continual rejection of his offer indicated to Meyer that, to the Struves, "family . . . farming means more than all the money."

We adopt the remaining factual background from the district court's thorough statement of factual findings, which are supported by the evidence presented at trial:

> As George aged and his children moved away or grew busy with their own lives, Perry began to take on a bigger role at the farm. He farmed with his dad from roughly 1990 until 2015. At some point . . . Delores and George began renting land to a local farmer, Eric Meyer. The goal was to use that rental income to generate enough revenue to pay the property taxes on the land. This would allow Perry to farm the remaining acres in an informal agreement with his father. . . . Eric asked Delores and George if he could rent more land from them, [but] the couple declined and expressed their desire for the farm to remain in the family. . . . Eric's testimony was clear: George and Dolores rejected his offer[s] [to rent more property]—knowing that they might be leaving some money on the table—to allow their son and grandson the opportunity to farm at more affordable rental rates.
>
> The conflict [giving rise to the parties' litigation] began after Delores died in the spring of 2014. In the fall of 2014, Perry's son Clayton and Clayton's cousin Carson expressed a desire to rent George's land to start their own farming operation. George, wanting to give them a chance to get on their feet, rented his land to them at

---

[3] One witness testified, "[George] enjoyed, I think, the fact that he lived on a farm, and what he was doing out there." For example, the witness offered, "If you offered George Struve two weeks pre-paid, everything paid, trip to Paris or an opportunity to sit in his rocking chair on his rear deck and drink a cup of coffee, he'd taken the coffee on the deck. . . . I did not see that he was—reflected any indication of incompetency. He simply didn't have, from what I could perceive, significant interest in the financial component of things."

the same rate Eric Meyer paid for the 2015 crop year. Leases were signed in October and December 2014. The December leases extended for 5 years, an unusually long term for farm leases. At some point Dianne learned of these leases and expressed her displeasure. She was very concerned about George having enough money to support himself if he needed to move to a nursing home.

In December 2014 and [early] 2015, George met with attorney Bob McGee since McGee was probating the Delores Struve estate and George was the executor. McGee expressed the same concerns as Dianne about George's cashflow and potential financial issues. Being careful not to create an ethical conflict McGee suggested and arranged a meeting between George and attorney Drew Chambers (Chambers) on January 26, 2015. Perry drove George to this appointment. During this meeting George told Chambers he had no desire to change anything with his estate plan.

Perhaps motivated by Dianne's objections to the leases, Perry and Clayton drove George to see attorney Glenn Bartelt (Bartelt) in Maquoketa later in the day on January 26, 2015. The three of them met with Bartelt as an introduction [on January 16, 2015], and then Bartelt met with George alone [on January 26] to discuss his estate plan. During this meeting George expressed that his overarching desire was to keep the farm in the family, and ideally with a family member farming the land. As Bartelt recalled, the plan was to divide all the land equally among the four children but to place a covenant on the land that would allow Clayton to farm the land at prescribed rents based on the Iowa State University [(ISU)] Extension rates. Witnesses testified that this arrangement would favor Clayton because the ISU rates were usually lower than market rents and this plan would allow Clayton to build his farming operation in the early years. For reasons unknown to anyone, this estate plan was never put into place.

In February 2015, the leases signed in the fall/winter of 2014 were rejected by George individually and as executor for Delores's estate because the leases took unfair advantage of George, according to a letter from McGee's office. A couple of reasons for this assertion were the five-year term at a reduced rate and the requirement of a personal guarantee from George. At the same time George rejected the leases for Perry, Clayton, and Carson, he was offered a market rent lease by Dianne and [her husband] Dell. The difference between the two leases was between $20,000 and $30,000. This sum [was] significant especially considering George's advanced age and the prospect that he may need to live in a nursing home in the near future. All of these issues were the subject of a family mediation that occurred in late February 2015.

The result of the mediation was a one-year lease with George renting to Perry, Clayton, and Carson. Perry, Clayton, and Carson would pay the same rents as Eric Meyer had for the first year and

then had an option for a second year at those rates. Following the 2016 crop year, the rents would be increased gradually to eventually reach a market rate. . . . During these negotiations it became known that Dianne and Dell had no intention of actually farming the land [that they had proposed renting], they would sublease to Eric Meyer. The reason they were involved was to help George feel better about renting to family.

On June 19, 2015, Bartelt met with George again to discuss the estate plan. Perry and Clayton drove George to this meeting but were not involved in any discussions between George and Bartelt. At this meeting, George wanted to make some major changes to his estate plan. These changes included giving Perry the "Boyson Farm" and giving Clayton the "Struve Farm South" and "Struve Farm North." The remaining 1/2 section of land would be divided equally among the four children. While the value of the land has fluctuated, the total amount of the gift, as reported in the Form 709, was $4,131,274. This gift would amount to roughly 2/3 of George's land holdings and would encompass the "best" farm ground that he had. During the meeting, Bartelt had no concerns that George was being unduly influenced, nor did he have any concerns about George's cognitive ability. The meeting concluded with Bartelt being instructed to draw up the necessary documents and put the plan into effect.

In July 2015, George fell while farming and was hospitalized with a broken hip. Perry informed Bartelt that George was in the hospital. Bartelt drafted a will and powers of attorney naming Perry as power of attorney (POA). Perry was not informed he was George's POA while George was in the hospital. The July 13, 2015, will memorialized the plan discussed at the June 19, 2015 meeting between George and Bartelt. Importantly, this will designated Paul as executor with Perry and Ron as alternate co-executors if Paul could not serve. George signed the will and the powers of attorney at the hospital. The Plaintiffs were not informed about this will or the powers of attorney.

Following his hospitalization, George went to The Alverno, a rehabilitation/nursing facility, to rehabilitate his hip. While there, McGee took George a POA to sign which made Dianne and Ron his attorney in fact. This POA was a "stand-by" POA meaning Dianne and Ron would not have the authority to act unless and until George was certified as disabled by his physician. Dianne and Ron did not tell Perry about the POA executed in August 2015.

George moved in with Perry when he was discharged from The Alverno. Just after [George moved] in with Perry, [Perry, Clayton, and Carson] terminated the mediated lease and executed new leases [with George]. The leases executed in September 2015 were for three-year terms and at reduced rental rates consistent with what Eric Meyer was paying. These rates were consistent with the

mediated lease terms for crop year 2016 but deviated from the annual review everyone planned on following the 2016 crop year.

On October 23, 2015, George, Perry, and Clayton went to Bartelt's office where George signed deeds giving the Boyson Farm to Perry and the Struve North and [Struve] South [f]arm to Clayton consistent with his July 2015 will. [Perry and Clayton waited in the office waiting room as Bartelt met with George.] Bartelt recalled George presenting the deeds to Perry and Clayton at the office. According to Bartelt, Perry was nonchalant about the transaction, but Clayton was astonished. No one informed Dianne, Ron, or Paul of the land transfers for about one year.

The next series of relevant events occurred in February 2016. Conflict among the siblings continued, resulting in Clinton County Deputy Jessup Shroeder visiting George at Perry's house on February 16, 2016, to investigate possible financial exploitation on the part of Perry. During this interaction, Clinton County deputies talked with Perry and George about his financial situation. George answered their questions and stated he knew what was going on with his finances and was comfortable with the situation. While George showed his age during this conversation, nothing about conversation showed that George was cognitively impaired so as to render him disabled.

About a week after the deputies visited George, Dianne, Ron, and Paul met with George to discuss his estate plan with him. During this conversation, George remained very quiet and was not forthcoming about the land transfers he'd executed in October 2015. Following the meeting, Dianne and Ron took George to McGee's office where George signed another POA. This time, the POA named Dianne or Ron as agents and was effective immediately rather than upon a finding of disability. A few days after this meeting, George went to Bartelt's office to revoke [this new POA naming Dianne or Ron as agents].

After the back and forth with the POAs and George expressing his frustration with the discord between his children, [George] entered into a voluntary conservatorship on the advice of attorney Steve Kahler in the summer of 2016. By the fall of 2016, George was showing signs of dementia and cognitive difficulties. In September 2016, Dianne, Ron, and Paul filed for an elder abuse protective order alleging financial exploitation. George was removed from Perry's home and resided at Eagle [Point] nursing home until his death in 2020.

(Footnotes omitted.)

Plaintiffs initiated the current lawsuit more than a year after the "Previous Litigation"[4] ended. Defendants moved for partial summary judgment, arguing Plaintiffs should be estopped from retrying any legal holdings or factual findings made in the Previous Litigation. The district court granted the motion in part—to the extent that it related to "the factual findings and holdings established in the Previous Litigation"—but denied the motion as to Plaintiffs' common law claims. Plaintiffs filed multiple motions seeking the court's reconsideration of the partial summary judgment ruling, but their motions were denied each time.

A different district judge assumed the trial court proceedings. Thereafter, Defendants filed a "motion to adopt facts and holdings" that Defendants asserted were found and determined in the Previous Litigation. The district court held a hearing on the matter and determined that "in this case adopting the previous findings in their entirety could cause more issues than resolve them." Accordingly, the district court stated it would adopt only the factual findings agreed to by both parties and that the remaining proposed facts "may be proved during the trial."

Following a three-day bench trial held in January 2024, the district court issued its final ruling and denied all of Plaintiffs' claims. Plaintiffs appeal.

---

[4] We adopt the parties' use of the term "Previous Litigation" in referencing the elder abuse proceedings initiated in 2016. We further note that our supreme court confirmed the findings by the district court in the Previous Litigation that George was not a vulnerable elder at the time of the challenged transactions, specifically the below-market-rate lease agreements, gifts of some of George's land to Perry and Clayton, and the newly written will to reflect the gifted land. *See Struve v. Struve*, 930 N.W.2d 368, 371–74 (Iowa 2019).

## II.     Standard of Review

"Because this action is in equity, our review is de novo."  *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003); Iowa R. App. P. 6.907.  When we review actions in equity, "especially when considering the credibility of witnesses, we give weight to the fact findings of the district court, but we are not bound by them." *Mendenhall*, 671 N.W.2d at 454; Iowa R. App. P. 6.904(3)(g).

## III.    Issue Preclusion

Plaintiffs allege the district court erred when it held factual findings and rulings from the Previous Litigation precluded contrary findings in the current litigation.[5]   Defendants argue Plaintiffs have failed to raise a reversible error, claiming Plaintiffs were not precluded from pursuing any factual findings or rulings contrary to those made in the Previous Litigation.

Defendants initially challenge whether Plaintiffs preserved error on this contention.  The question of whether issue preclusion applied was briefed, argued at a hearing before the district court, and conclusively decided in a district court ruling on the motion.  Plaintiffs also filed multiple motions asking the district court to reconsider the ruling, all of which were denied.  And if that was all there was, we could find error was preserved.  *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).  But the previous ruling was not the order that was used in the trial. When the court entered its ruling on Defendants' motion to adopt facts and

---

[5] Plaintiffs claim they are also appealing each of the adverse rulings on their motions to reconsider the partial summary judgment ruling, but they raise no new issues directly with these rulings.  So our analysis on the issue preclusion challenge applies equally to any challenge to these rulings that Plaintiffs may have properly presented on appeal.

holdings, it made clear that it would only consider the facts from the Previous Litigation that were stipulated by the parties in this case, reversing course from the prior order. Neither party moved to reconsider this order. So we find this issue was not preserved.

But even if we were to reach the merits of this argument, we find no error by the court. As aptly put by Defendants, "there [was] no error for [Plaintiffs] to preserve" as the court only adopted facts agreed to by the parties. Plaintiffs have not pointed to any fact that the court adopted from the Previous Litigation that was not agreed to by the parties for purposes of trial here. And in oral arguments, Plaintiffs acknowledged that they cannot cite or identify any facts that the district court relied on from the Previous Litigation that were not agreed to by the parties.[6] In rebuttal, Plaintiffs' counsel stated, "The fact that we cannot identify what the [district court] did or didn't take into consideration is the problem. We don't know." We find this argument to be without merit. We find no error.[7]

## IV. Undue Influence

Plaintiffs also challenge the denial of their undue influence claims.

Generally, to succeed on an undue influence claim a plaintiff must prove by clear, convincing, and satisfactory evidence four elements existed at the time a transfer was made:

(1) The grantor must be susceptible to undue influence,
(2) opportunity on the part of the grantee to exercise such influence

---

[6] As part of these proceedings, Defendants filed a motion to adopt forty-nine facts from the Previous Litigation. The parties agreed to twenty of those facts. And Plaintiffs acknowledge in their briefing that the trial court did not use facts not agreed to by the parties.

[7] Given our ruling on issue preclusion, we elect not to address Defendants' mootness claim.

and effect the wrongful purpose must exist, (3) a disposition on the part of the grantee to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

*Mendenhall*, 671 N.W.2d at 454 (alterations omitted) (quoting *In re Est. of Herm*, 284 N.W.2d 191, 200–01 (Iowa 1979)). Plaintiffs can side-step the burden of proving these four elements by proving the "grantee [stood] in a confidential or a fiduciary relationship to the grantor." *Id.* If plaintiffs prove such a relationship existed, "the burden of proof shifts to the grantee to negate a presumption of undue influence by clear, convincing, and satisfactory evidence." *Id.* at 454–55.

Plaintiffs pursued a confidential relationship theory of undue influence as to both Perry and Clayton. The district court determined Perry stood in a confidential relationship to George but that Perry rebutted the presumption of undue influence. The district court determined Clayton did not stand in a confidential relationship to George. Without the presumption of undue influence, the district court determined Plaintiffs failed to prove their undue influence claim against Clayton. Plaintiffs allege the district court erred in determining Perry rebutted the presumption and that Clayton did not stand in a confidential relationship to George.[8]

## A.    Whether Perry Rebutted the Presumption of Undue Influence

To rebut the presumption of undue influence that arises from a confidential relationship, a grantee must only "prove by clear, satisfactory, and convincing evidence that the grantee acted in good faith throughout the transaction and the

---

[8] Because we affirm the district court's determinations that Perry rebutted the presumption of undue influence and that Plaintiffs failed on their undue influence claim against Clayton, we need not reach Plaintiffs' argument that the district court erred by declining to set aside the disputed deeds.

grantor acted freely, intelligently, and voluntarily." *Jackson v. Schrader*, 676 N.W.2d 599, 605 (Iowa 2003).

Considering the evidence of George's propensity to prioritize family farming over profit and his purpose of protecting the family farmland, Perry established the transfer of land to Perry was made freely, intelligently, and voluntarily. *See id.* (determining a daughter in a confidential relationship with her mother rebutted the presumption of undue influence when evidence showed the mother had a propensity to act in manners consistent with the challenged action and the challenged gift reflected the mother's free-will determination).

Testimony from multiple witnesses outside the family agreed that George's primary goal during his life and after his passing was that the Struve family farming operation continue as a family business. This goal aligns with the "typical pattern" observed in farming families' estate planning. *See Geerdes ex rel. Jenkins v. Cruz*, 7 N.W.3d 22, 33 (Iowa 2024) ("[T]he typical pattern is for the surviving spouse of a couple that had farmed to favor family members in disposing of any farm-related real estate."). Indeed, George's desire to keep the farms under family control was so strong that Dianne and Dell concocted a plan to oust Perry and Struve Boys Farms from their rented farmland so that Meyer could rent the same at a higher, market rate. Knowing George would not turn so much of the farmland over to someone outside the family—i.e., Meyer—Dianne and Dell submitted their offer under their own names without disclosing their plan to later sublease to Meyer. Bartelt also testified that in June 2015 George was "unalterably opposed" to Dianne obtaining "a quarter of the farmland to sell." It was Bartelt's impression that George's desire to "put that out of [Dianne's] reach" was George's motivation

for transferring the property to Perry and Clayton rather than proceeding under the January 2015 plan to divide Geroge's ownership of the properties equally among all four of George's children.

We also observe the record indicates George received proper independent legal advice prior to the transfer. *See Natvig v. Natvig*, No. 23-1992, 2024 WL 4611522, at *7 (Iowa Ct. App. Oct. 30, 2024) (considering the grantor's "benefit of proper independent advice before the transfer" as a factor in determining the grantee rebutted the presumption of undue influence). As the district court stated, although "Perry took his father to Glenn Bartelt and other attorneys[,] . . . George met with those attorneys on his own." None of these attorneys represented Perry or Perry's farming interest. Each of these attorneys indicated they had no concern whatsoever that the transfers were the product of undue influence. We agree with the district court: "Bartelt was adamant that this was what George wanted."

In determining Perry sufficiently proved he acted in good faith, the district court compared Dianne's conduct and her witness credibility to Perry's. The district court reasoned:

> It was obvious from Dianne's demeanor and testimony that she felt strongly that George should be getting more cash rent from his tenants. Dianne struck the Court as the eldest sibling who had a strong desire to help her father maximize his income. The Court believes her motives were, for the most part, in her father's best interests. She was concerned about his long-term care and worked to make sure he had enough cashflow to pay for his potential expenses without putting the land at risk. Those concerns, and her proposed solution, were reasonable. The problem was, that's not what George wanted to do.
> Dianne and Perry were each taking George to attorneys to try to accomplish their goals. The reason Perry "won" is that he allowed George to put the plan he wanted in place. Dianne, despite her valid concerns, pushed George to take more drastic measures than he originally intended. . . .

. . . .

This brings the Court to the challenging position the Plaintiffs are in, specifically Dianne. The issue they have had here as well as the [P]revious [L]itigation is their effort to paint George as incompetent to make significant life decisions, particularly involving finances. At the same time, they asked him to execute multiple POAs during the same time that he was deciding on his land. Dianne lost credibility with the Court when she explained that she had George sign a new POA in February 2016 because she "forgot" he signed the one in August 2015. Dianne, Ron, and Dell lost credibility with the Court when they were asked to give examples of George's diminished cognitive ability. . . .

Put simply, the district court found "one of the frequent examples" provided by Dianne, Ron, and Dell to be so universal—even among "people who have no cognitive issues at all"—that the three witnesses strained their credibility simply by providing the example.[9]

We agree Perry established he acted in good faith. In addition to the above, Perry testified that his involvement with contacting attorneys for George was done according to George's requests. He participated in the February 2015 lease mediation despite the likelihood that less favorable lease terms were the likely (and indeed actual) result. And nothing indicates Perry begrudgingly absented himself from conversations between George and the attorneys. Rather, evidence showed a willingness to give George the space to discuss sensitive matters—not only did Perry not return to the hospital when Bartelt met George to execute the new will in July 2015, despite being the one to arrange the meeting, but also when Clinton

---

[9] In February 2015, George participated in a mini-mental status examination wherein he scored 29 points, with the maximum score being 30. His primary physician performing the examination remarked that he saw "no defect in his memory or decision making" and that his mental status was "very good."

County deputies visited to investigate the elder abuse claim, Perry volunteered to leave so the deputies could talk with George alone.

For the reasons above, upon our de novo review and giving due deference to the district court's witness credibility determinations, we affirm the district court's finding that Perry rebutted the presumption of undue influence by clear, satisfactory, and convincing evidence.

**B. Whether Clayton was in a Confidential Relationship with George**

Plaintiffs asserting a confidential relationship theory of undue influence must clearly establish the existence of the confidential relationship. *Geerdes*, 7 N.W.3d at 30. A confidential relationship will not be inferred or presumed. *Id.*

"A confidential relationship 'embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs.' It 'arises whenever a continuous trust is reposed by one person in the skill and integrity of another.'" *Id.* at 28 (quoting *Mendenhall*, 671 N.W.2d at 455). After reciting the standards for finding a confidential relationship and reviewing prior court decisions, our supreme court explained in *Geerdes*, "[o]therwise stated, to prove a confidential relationship in order to shift the burden for undue influence purposes, one has to prove that the grantee was already a dominating influence on the grantor." *Id.* at 33.

Plaintiffs make three discernible arguments to support their challenge to the district court's determination that no confidential relationship existed between George and Clayton. First, they cite to a paragraph in *Mendenhall* that observes a confidential relationship "is particularly likely to exist where there is a family relationship." *See* 671 N.W.2d at 455. Assuming their inclusion of this observation

stands for the argument that Clayton's status as George's grandson indicates a confidential relationship existed, we are unmoved.  *See Geerdes*, 7 N.W.3d at 30 ("Iowa decisions have repeatedly emphasized that family and personal ties are not enough to create a confidential relationship in this context; one person must have trusted the other to handle their affairs.").

Second, Plaintiffs point out Clayton acted primarily in his own interest and the interest of Struve Boys Farms and that Clayton openly admitted he felt no duty "to act with the utmost good faith for the benefit of George."  But the fact that Clayton felt no such duty is not evidence that Clayton had such a duty or stood in a confidential relationship.  And Plaintiffs point to no evidence that George believed or could have reasonably believed Clayton was acting in George's best interests.  In short, to the extent Plaintiffs claim Clayton's self-interested actions show he held a confidential relationship to George, their argument has put the cart before the horse.  *See id.* at 30–33 (indicating that cases in which there was a confidential relationship and those in which there was not are distinguishable by whether the grantee took over the grantor's affairs such that the grantor could reasonably presume the grantee would act in the grantor's best interests); *see also Dibel v. Meredith*, 10 N.W.2d 28, 31 (Iowa 1943) ("[A] confidential relationship arises where one person gains the confidence of another and purports to act and advise with the other's interest in mind."); *Merritt v. Easterly*, 284 N.W. 397, 405 (Iowa 1939) ("The relation was also a confidential one, because she had abiding faith and trust in him, and relied upon him to advise and act with her interest only in mind.").

Third, Plaintiffs argue George did not receive proper independent legal advice and, on that ground alone, the district court's ruling is reversible.  *See*

*Mendenhall*, 671 N.W.2d at 462 ("A lack of independent advice is sometimes sufficient in and of itself to set aside conveyances and contracts executed under such circumstances."). Their only record citation supporting this argument is to Clayton's testimony that sometime after January 16, 2015, an attorney at Bartelt's firm, other than Bartelt or Kahler, started doing work for Clayton and Carson on behalf of Struve Boys Farms. The evidence presented only shows that this other attorney established Struve Boys Farms as an LLC and sent the notice to George, individually and as executor of Delores's estate, notifying George of the termination of the mediated farm lease. No evidence was presented to establish what, if any, other work this attorney did on Clayton's or Struve Boys Farms's behalf. Under these circumstances, in which Plaintiffs have not presented clear evidence that it would be reasonable to believe Clayton had a duty to act in George's best interest, we decline to determine any impropriety related to Clayton that may have occurred in George's legal advice was so improper that it alone can establish the existence of a confidential relationship.[10]

---

[10] Plaintiffs do not raise the improper-legal-advice argument as a separate issue but rather assert it in support of their challenge to the confidential relationship holding about Clayton. But the authorities they provide do not clearly indicate that the propriety of a grantor's legal advice is a factor used to determine the existence of a confidential relationship when other evidence has not already established the grantee owed a duty to act in the grantor's best interest. *See Mendenhall*, 671 N.W.2d at 460–62 (reviewing the district court's standard four-factor undue influence analysis, which the district court conducted without shifting the burden to the defendant despite making an initial determination that a confidential relationship existed); *Merritt*, 284 N.W. at 402–05 (discussing significant evidence that established a "de facto guardianship" before analyzing whether the "donor" received proper independent legal advice). To the extent they raise this argument to claim the deed should be voided even absent a confidential relationship, and assuming that question would be properly before us, for the same reasons just discussed, we would deny Plaintiffs' claim.

In determining no confidential relationship existed between Clayton and George, the district court set out the following findings.

> The Court finds that the Plaintiffs failed to prove that Clayton and George had a confidential relationship. While there was testimony that Clayton accompanied George and Perry to appointments with attorney Bartelt and testimony that George may have trusted Clayton, the Court does not find that this rises to the level of "continuous trust." In reviewing the evidence, Clayton and George had a reasonably close grandfather/grandson relationship. Clayton's emotion on the witness stand and in the courtroom at various times showed how he felt about this relationship. While confidential relationships are likely to exist between family members, "not every family relationship creates a confidential relationship." [*In re Est. of Kline*, No. 18-1658, 2019 WL 6358421, at *4 (Iowa Ct. App. Nov. 27, 2019)].
>
> The broadest definition of a confidential relationship involves one party (George) relying on and trusting another (Clayton) with his most important affairs. *Id.* Even under that definition, there was no evidence that George trusted Clayton with his important affairs. He may have given him his most prized asset, but the evidence at trial was that during this time Clayton was running around living his life in his early twenties and wasn't involved in the day-to-day of managing his grandfather's affairs. This is best shown by the involvement of Perry and Dianne. If Clayton had been a trusted figure, neither of them would have been as involved as they were. Clayton no doubt received a significant benefit with the land transfers, but having a good relationship with your grandfather and receiving a significant gift towards the end of his life do not, in and of themselves, prove a confidential relationship under the law.

We agree with the district court's determination, and we affirm this issue.

## V. Conclusion

Because the record confirms the district court allowed the parties to fully litigate all factual disputes and claims raised and disregarded the initial ruling on issue preclusion, Plaintiffs' issue-preclusion challenge fails. For the reasons discussed above, we affirm the district court's rulings on Plaintiffs' undue influence claims against Perry and Clayton.

**AFFIRMED.**